Jaqualin Friend Peterson (Bar No. 6226)
Alex G. Peterson (Bar No. 6306)
**PECK PETERSON, LLP**
675 East 2100 South, Suite #350
Salt Lake City, UT  84106
Telephone: (801) 521-0844
Fax (801) 610-2115
jaqalin@peckpeterson.com
alex@peckpeterson.com

*Attorneys for Plaintiff*

# IN THE THIRD JUDICIAL DISTRICT COURT
# IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MARTHA ELLIS,<br><br>      Plaintiff;<br><br>vs.<br><br>SALT LAKE CITY CORPORATION, a political subdivision of the State of Utah and its Fire Department; JACKIE BISKUPSKI, an individual; BRIAN DALE, an individual; KARL LIEB, an individual; and ROBERT MCMICKEN, an individual,<br><br>      Defendants. | **COMPLAINT**<br><br><br>Case No.<br><br>Judge |

COMES NOW Plaintiff Martha Ellis ("Ms. Ellis"), by and through her undersigned counsel, to complain against Defendants Salt Lake City Corporation ("SLC") and its Fire Department, Jackie Biskupski, Brian Dale, Karl Lieb, and Robert McMicken (collectively "Defendants") as follows:

1

## I.     NATURE OF CASE

This is an action against Defendants seeking redress for the adverse employment acts against Ms. Ellis in violation of the Utah Protection of Public Employees Act ("The Whistleblower Act"), Utah Code Ann. § 67-21-1 et seq.

## II.    PARTIES

1.      Ms. Ellis is an individual residing in Salt Lake County, Utah.  At all relevant times, Ms. Ellis was employed by SLC as an officer within the Fire Department.  Ms. Ellis was demoted from her position as Battalion Chief to Captain by former SLC Fire Department Chief Brian Dale under the direction and/or acquiescence of Mayor Jackie Biskupski. Acting Fire Chief Karl Lieb and Assistant Fire Chief Rusty McMicken also participated in Ms. Ellis' demotion.

2.      Defendant Salt Lake City Corporation (SLC) is a political subdivision.

3.      Defendant Jackie Biskupski is the Mayor of SLC.

4.      Defendant Brian Dale is the former SLC Fire Chief.  At all relevant times herein, Dale was the SLC Fire Chief or a Deputy Chief and was one of Plaintiff's supervisors.  During his time as Fire Chief, Dale was also on the oversight Board over the SLC 911 Center.

5.      Defendant Karl Lieb is the Acting Fire Chief for the SLC.  At all relevant times herein, Lieb was a Deputy Fire Chief and was one of Plaintiff's supervisors.

6.      Defendant Robert (Rusty) McMicken is an Assistant Fire Chief for SLC.  At all relevant times herein, McMicken was one of Plaintiff's supervisors.

7. Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants herein was, at all times relevant to this action, the agent, employee, representing partner, joint venturer and/or joint conspirator of the remaining Defendants and was acting within the course and scope of that relationship.  Plaintiff is further informed and believes, and thereon alleges, that each of the Defendants herein gave consent to, ratified and authorized the acts, conduct, or omissions alleged herein to the remaining Defendants.

### III.   JURISDICTION AND VENUE

8. This Court is vested with jurisdiction over this matter pursuant to Utah Code Ann. § 67–21–4.

9. Venue is proper in this District pursuant Utah Code Ann. § 67–21–4 as a substantial part of the vents alleged herein occurred and Plaintiff resides within this judicial district.

10. On June 2, 2016, Ms. Ellis sent Defendants a Notice of Claim under the Governmental Immunity Act of Utah, Utah Code Ann. § 63G-7-401 *et seq.*, alleging that Ms. Ellis had suffered an adverse employment act (i.e., wrongful demotion) in violation of the Utah Whistleblower's Act among other things.  None of the Defendants have responded to the Notice of Claim.

11. This action is a Tier 3 case in that Plaintiff is seeking present and future economic and other damages in excess of $300,000.

### IV.   GENERAL FACTUAL ALLEGATIONS

12. Ms. Ellis has been employed with SLC for approximately 21 years.  For the duration of that time, she has worked for the SLC Fire Department.

13. Ms. Ellis was sworn in as a Battalion Chief on or around May 7, 2009.

14. Ms. Ellis served at this rank for seven years until SLC demoted her from Battalion Chief to Captain on May 3, 2016.

15. As a Battalion Chief, Ms. Ellis had a solid work record. She held the position of Fire Marshal from May 7, 2009 through October 17, 2014, and at the time of her demotion Ms. Ellis was the Division Chief of Logistics.

16. Ms. Ellis is the only SLC Battalion Chief, and possibly the only fire fighter in the SLC Fire Department, who has received a Master's Degree from the Naval Postgraduate School and earned a fellowship to Harvard University's Senior Executives in State and Local Government Program.

17. Prior to her demotion, Ms. Ellis was the most highly decorated female officer within SLC Fire Department.

18. All of this changed, however, when Ms. Ellis voiced her opposition to Mayor Biskupski regarding various practices of the executive members of the Fire Department, including their active participation in committing time and attendance fraud both personally and as a matter of Department policy as well as their attempt to cover-up their participation and/or acquiescence in deliberate violations of the Utah Fire Code Act, 15A-5-101 *et seq*. (hereinafter "State Fire Code").

*Time/Attendance Fraud*

19. In or around March 2015, Ms. Ellis uncovered information that suggested the Fire Department was knowingly allowing members of its executive team to engage in personal

4

pursuits on "City time" without requiring adequate disclosure or any accounting of such time or a reduction in their pay.

20. Sometime later, Ms. Ellis also learned that the members of the Fire Department's executive team were condoning a practice of making "adjustments" to TeleStaff (the automated scheduling software used by the Fire Department) so as to show and ultimately pay certain employees for working a 40-hour work week even when they were assigned shifts in which they did not actually work that many hours.

21. A prime example is the three 12-hour shifts that the Fire Department advertised as an incentive for the Mobile Response Team (MRT) application announcement memo dated August 5, 2015. Though such team members were told they would only be scheduled to work a 36-hour workweek, according to Lieb and other members of the executive team, "The party line is that they're working 40 hours. We'll just adjust it in TeleStaff."

22. Another example is Dale's conflict of interest disclosure. It is incongruent with his public admissions relating to his personal time spent and fees received for working with IEAD and related entities.

23. Ms. Ellis reasonably believed such actions to be in violation of various SLC policies and ordinances, to include those that govern the use of appropriated funds, fraud prevention and detection, and expected standards of conduct, as well as a violation of state law, as follows:

    a. Salt Lake City Policy 2.01.01, dealing with the expenditure of public funds, states that SLC may spend funds "only for legitimate purposes."

  b. Salt Lake City Policy 2.01.02 further explains that the City will pay for the reasonable cost of travel that employees incur during the performance of their jobs, but not any personal expenses.

  c. Pursuant to Salt Lake City Policy 3.02.01, subs. 1.3, City employees are required to devote their whole time, attention, and efforts to City business.

  d. Salt Lake City Policy 3.02.01, subs. 1.8, prohibits City employees from falsifying or altering documents, or otherwise providing false or intentionally misleading information. It also prohibits malfeasance, nonfeasance, or acts inimical to the public service, failure to comply with state or local law, where such action adversely reflects on the employee's ability to perform assigned duties or is inimical to the public service, and filing a malicious, fraudulent, or frivolous complaint with the intent to cause harm, disrupt City services, or with reckless disregard or intent to harass.

  e. Pursuant to Salt Lake City Policy 3.02.01, subs. 2.1, City employees are to "strictly avoid conflicts of interest."

  f. Salt Lake City Policy 3.02.12 states that the City "does not tolerate fraud, misappropriation, theft, misuse, or misapplication of City resources or assets by any employee…," and that any "[e]mployees who violate this policy will be disciplined, up to and including termination." *See* subs. 1.1 & 1.4. "Fraud" is further defined to include: any fraudulent act, misappropriation of funds, impropriety in the handling or reporting of money or financial transactions, payroll fraud including misuse of time or submitting a fraudulent time card, and any similar or related irregularity. *See* subs. 2.2. Finally, this

6

policy applies to "any irregularity, or supsected irregularity, involving employees…." *See* subs. 1.3.

    g.    The Utah Public Officer's and Employee's Ethics Act, U.C.A. § 67-16-1 *et seq.*, prohibits public employees from having personal investments in any business entity which create a substantial conflict between his private interests and his public duites. *See* U.C.A. § 67-16-9.

    h.    Likewise, pursuant to the Municipal Officers' and Employees' Ethics Act, U.C.A. § 10-3-1301 *et seq.*, it is an offense for an elected or appointed officer or municipal employee to "use or attempt to use the officer's or employee's official position to … further substantially the officer's or employee's personal economic interest." *See* U.C.A. §10-3-1304(2)(b)(i).

    i.    S.L.C. Ordinance 2.44.040 prohibits a public servant of the City from corruptly using or attempting to use the public servant's official position to further substantially the public servant's financial or professional interest. Further, SLC Ordinance 2.44.060 states that "[n]o public servant … shall engage in any outside employment that is inconsistent, incompatible, or in conflict with his … duties as a public servant…. Such prohibited outside employment includes, but is not limited to, employment … involving the use for private gain or advantage of his … city working time …." Payments for "travel, food, lodging, or entertainment expenses, or reimbursement therefore, or any other compensation or cash honorarium, made to a public servant in connection with a public event, appearance, or ceremony unrelated to

7

official city business or not furnished by the sponsor of such public event, appearance, or ceremony, shall be considered outside employment under this section." *Id.*

24. On or around May 5, 2015, Ms. Ellis reported her concerns as it relates to members of the executive team being paid by SLC for time that they were engaging in personal pursuits to City Attorney Jonathan Pappasideris in a written letter.

25. Thereafter, on or around September 1, 2015, Ms. Ellis reiterated these same concerns in a meeting that she had with Melissa Green, EEO Program Manager, as part Green's investigation of other claims against the Mayor's Office (Ralph Becker was Mayor at the time), the Fire Department and its executive team. Ms. Ellis also told Ms. Green about the fraudulent time and attendance practices being condoned by the Fire Department's executive team. Ms. Green purportedly investigated these matters (in conjunction with other allegations raised by Ms. Ellis) and found the claims unsubstantiated.

26. On November 3, 2015, the residents of Salt Lake City elected a new mayor—Jackie Biskupski.

27. Believing the new administration would want to start off on a clean slate, Ms. Ellis reached out to Mayor Biskupski in an effort to inform her of the Fire Department's erroneous time and attendance practices, among other infractions.

28. In response, Mayor Biskupski told Ms. Ellis to direct her communications to the Mayor's Director of Communications, Matthew Rojas, which Ms. Ellis did on or about December 2, 2015.

8

29. When Ms. Ellis told Mr. Rojas that she had reason to believe that Dale had been showing himself as present and accounted for in the Fire Department's staffing document while going out of town on International Acadamies of Emergency Dispatch (IAED) business, Rojas exclaimed, "Holy shit!"

30. Ms. Ellis also told Mr. Rojas that she also had reason to believe that the media was not done with the SLC 911 Center story.

31. Thereafter, on February 21, 2016, the Salt Lake City Tribune ran an article about Fire Chief Dale's potential "conflict of interest" with Priority Dispatch and its nonprofit affiliate, IAED, which provide emergency dispatch protocols to SLC. This article confirms many of Ms. Ellis' allegations. Specifically, the article highlights Dale's time away at IAED conferences and the discrepancies in his computerized calendar and payroll records. The article further states that Dale "was out of the office 32 days in 2012 for which he was paid by the city and not labeled as vacation." Likewise, the article notes that from the period Aug. 31, 2010 to April 17, 2015, Dale "was 'out of the office' with no other explanation 38 times."

32. In response to the allegations, Mayor Biskupski is quoted as saying, "We will definitely look into it."

33. Upon information and belief, SLC failed to fully investigate the issue.

34. Upon information and belief, SLC also failed to discipline the former Fire Chief in accordance with its applicable policies, ordinances, and procedures.

*SLC Fire Station No. 2*

35.     In addition to informing the Mayor about the Fire Department's fraudulent time/attendance practices, Ms. Ellis spoke to Mr. Rojas about certain concerns she had regarding SLC's Fire Station No. 2.

*36.*     Specifically, on or about December 29, 2015, Ms. Ellis told Mr. Rojas that there were issues with the lack of smoke detection in Station 2 prior to the fire in March of 2015. She also told Mr. Rojas that some of the members of the crew involved (and herself) were not happy with the Fire Department's position on the safety conditions in that the Fire Department was attempting to cover-up deliberate violations of the State Fire Code.

*37.*     Ms. Ellis said that the Fire Department was trying to place the blame for such violations on her because she was the Fire Marshal at the time, notwithstanding that the Fire Department never sought her opinion on the matter and that it was Assistant Chief McMicken (in his former capacity as Division Chief of Logistics) who had approved the smoke detection installation at Fire Station No. 2 even though it did not comply with the State Fire Code.

*Fire Department Access Requirements and Bike Lanes on Broadway*

38.     On or about January 19, 2016, Ms. Ellis again contacted Mayor Biskupski, through Mr. Rojas, to inform her that Ms. Ellis was receiving pressure from within the Fire Department to use her influence with the SLC Fire Department Engineer Committee to persuade them to give their "seal of approval" on the current road design of 300 South, or "Broadway" as it is also known.

39.     The roadway as presently designed does not comply with the State Fire Code.

40. The Fire Department knew this. Nonetheless, the Fire Department was trying to cover up the fact that it had approved the building of the bicycle barriers in deliberate violation of the State Fire Code.

41. On January 19, 2016, Fire Marshal Mellor told Ms. Ellis that he had been instructed to "make it right." Fire Marshal Mellor then instructed Ms. Ellis to invite Robin Hutcheson, Transportation Director, to attend an up-coming SLC Frie Department Engineer Committee meeting. Seeing this as an attempted cover-up, Ms. Ellis refused to participate and informed Mellor that the Engineer Committee couldn't give their seal of approval on the narrowed road widths; they didn't have the authority to do so because the road does not meet the State Fire Code. In response, Fire Marshal Mellor was adamant that "he" had the authority to manipulate the State Fire Code.

42. Although Ms. Ellis was the Fire Marshal when SLC added the concrete bicycle barriers to Broadway, she did not approve their construction. Rather, as she explained to Mr. Rojas, the Fire Department was a "house divided" on this issue with her on the opposing side. Ms. Ellis also told Mr. Rojas that she possessed written communications which would show that (contrary to the Fire Department's claims) she had opposed narrowing the road width for bike lanes long before any construction began on 300 South, precisely because with their installation the roadway did not meet the Fire Code. Notwithstanding her opposition, SLC with the sanction of the Fire Department moved forward with the bicycle project. According to Ms. Ellis, this is because certain individuals within the Fire Department believe that the State Fire Code can be manipulated, at will, and those same individuals made the initial decision without consulting the Fire Prevention Office (i.e., the Fire Marshal).

43. On April 5, 2016, the Salt Lake City Tribune published an article entitled "Salt Lake City's Broadway Violates Fire Code." As its title suggests, the article examines the problems surrounding the present design of the roadway, implicating both the Fire Department and Transportation. In response, the Fire Department issued its own statements contradicting the claim. Specifically, the Fire Department asserted that there had been a purported "miscommunication between the agencies during the planning of the protected bike lanes," and that the "verbal approval came after the concrete bicycle barriers were in place." Both statements misrepresent the timing and content of the actual communications that took place, which are documented in writing.

44. Upon information and belief, SLC never conducted any investigation into either of these cover-ups relating to the State Fire Code violations, even after Ms. Ellis reported her concerns.

45. Upon information and belief, no Fire Department individuals were counseled, sanctioned or disciplined in accordance with SLC policies, ordinances, or procedures, for their involvement in the aforementioned cover-ups.

46. Ms. Ellis reasonably believed such actions to be in violation of both State and City law, as follows:

    a. Utah Code Ann. § 53-7103(4) states that "state fire marshal shall enforce the State Fire Code and rules. . . ."

    b. Utah Code Ann. § 53-7-104(2) states that the "fire officers of any city or county shall enforce the State Fire Code and rules of the state Fire Marshal in their respective areas."

  c. The International Fire Code § 104.1, which has been adopted by both SLC and the State of Utah, states that State Fire Code 'interpretations, policies, procedures, rules and regulations shall be in compliance with the intent and purpose of this code and shall not have the effect of waiving requirements, specifically provided for in this code."

### *SLC's Demotion of Ms. Ellis and Other Adverse Actions*

47. On March 16, 2016, just three weeks after the publication of the article criticizing Former Fire Chief Dale and within just a few months of Ms. Ellis' reports to Mr. Rojas, SLC and the Fire Department issued Ms. Ellis a pre-determination notice informing her that she was being placed on paid administrative leave while SLC considered disciplinary action against her purportedly because she failed to meet certain performance expectations.

48. Ms. Ellis has a well-established track record during her employment with SLC of exemplary performance, proven leadership, a collaborative management style, and timely completion of assignments.

49. Ms. Ellis is also well respected by her colleagues and peers both inside and outside the Fire Department, and her subordinates.

50. Nonetheless, Ms. Ellis' superiors claimed that she purportedly demonstrated a lack of engagement with her current work assignment, a lack of ownership of her job responsibilities, an inability or unwillingness to follow instructions, and a lack of respect for the chain of command.

51. None of the Fire Department's claims have been substantiated by objective evidence.

52. The Fire Department also threatened to terminate Ms. Ellis' employment if she attempted to speak to anyone at the Fire Department about her placement on paid administrative leave or the Fire Department disciplinary proceedings against her.

53. Upon receipt of her pre-determination notice, Ms. Ellis was escorted out of the workplace in front of all her co-workers.

54. On the same day, Ms. Ellis was ordered to take no action as a SLC employee nor represent herself as an employee of SLC.

55. Upon information and belief, SLC has never placed a Fire Department Battalion Chief on administrative leave (paid or unpaid) or escorted a Fire Department Battalion Chief out of the workplace in front of all his/her co-workers absent allegations which would warrant immediate termination, such as theft, assault or attempted assault, a failed drug test, intoxication on duty, or similar egregious conduct.

56. For this reason, false and completely unsubstantiated rumors immediately started within the Fire Department that Ms. Ellis was caught doing cocaine in her office, had totaled her department vehicle while driving under the influence of alcohol and/or engaged in similarly egregious behavior.

57. Neither SLC nor the Fire Department did anything to squelch the false and completely unsubstantiated rumors even though they were made aware of them.

58. Believing that she was being subjected to retaliatory discipline because of her critical comments regarding the Fire Chief and his executive team, and concerned about her reputation and SLC's acquiescence in this effort, Ms. Ellis sought and obtained a private meeting

with Mayor Biskupski to reiterate her complaints regarding the Fire Department and its executives' unlawful behavior.

59. Ms. Ellis met with Mayor Biskupski on or about March 30, 2016.

60. In this meeting, Ms. Ellis explained (as she had previously done with Mr. Rojas) all of the things she had uncovered regarding the executive team's fraudulent time and attendance practices and their recent attempts to cover-up deliberate violations of the State Fire Code with respect to the fire alarms at Fire Station No. 2 and the bicycle barriers on Broadway. Ms. Ellis also provided Mayor Biskupski with details of the retaliatory treatment she experienced on a daily basis at the hand of her superiors, to include their most recent notice of discipline. Ms. Ellis hen handed Mayor Biskupsi the relevant code and statutory provisions which Ms. Ellis believed governed the situation.

61. Ms. Ellis' predetermination hearing was held on April 11, 2016.

62. In addition to her testimony, Ms. Ellis presented audio recordings and other written documentation refuting many (if not all) of the charges lodged against her.

63. None of her documentation was addressed by SLC or the Fire Department in their memorandum supporting Ms. Ellis' ultimate discipline. Rather, SLC and the Fire Department just reiterated the original subjective charges.

64. After her demotion, Ms. Ellis discovered that prior to her predetermination hearing members of the Fire Department's executive team were already informing other Fire Department employees, including her subordinates, that Ms. Ellis was being demoted.

65. Upon information and belief, Ms. Ellis' superiors made other disparaging comments about Ms. Ellis and her performance within the Fire Department to her colleagues, co-workers and subordinates.

66. Upon information and belief, the conversations regarding her demotion occurred before Ms. Ellis met with Mayor Biskupski. In other words, the Fire Department and SLC (presumably with the Mayor's acquiescence, since she was fully aware of the allegations and the ongoing proceedings) had already decided upon Ms. Ellis' discipline before actually meeting with her or giving her an opportunity to present her side of the story, thus rendering her predetermination hearing perfunctory and devoid any substantive due process.

67. The City demoted Ms. Ellis on May 3, 2016, and reduced her pay.

**FIRST CAUSE OF ACTION**

**(Violation of the Utah Whistleblower's Act
Pursuant to Utah Code Ann § 65-21-1 *et seq.*)**

68. Ms. Ellis reasserts and incorporates by reference all preceding paragraphs as if fully set forth herein.

69. The Utah Protection of Public Employee's Act, Utah Code Ann. § 65-21-1 *et seq.*, protects employees who communicate or object to violations of a state or federal law, rule or regulation. Specifically, Utah Code Ann. § 67-21-3(1)(a) states that "[a]n employee may not take adverse action against an employee because the employee . . . communicates in good faith: (i) the waste or misuse of public funds, property or manpower; [or] (ii) a violation or suspected violation of a law, rule, or regulation adopted under the law of this state, a political subdivision of this state, or any recognized entity of the United States."

70. Utah Code Ann. § 67-21-3(2) further states that "[a]n employer may not take adverse action against an employee because an employee participates or gives information in an investigation . . . or other inquiry . . . held by the public body."

71. Finally, Utah Code Ann. § 67-21-3(3) states that "[a]n employer may not take adverse action against an employee because the employee has objected to or refused to carry out a directive that the employee reasonably believes violates a law of this state, a political subdivision of this state, or the United States…."

72. As more specifically set forth above, Ms. Ellis communicated in good faith to Mayor Biskupski, SLC's Director of Human Resources, and City Attorney Jonathan Pappasideris that the Fire Department and its executive members, to include former Fire Chief Dale, present Acting Chief Lieb, and Assistant Chief McMicken, had engaged and/or were taking actions that violated various laws of SLC and the state.

73. Thereafter, SLC and the Fire Department began a campaign against Ms. Ellis because of her complaints about and objections to both the Fire Department and the executives' unlawful actions, including but not limited to the following:

   a. Placing her on administrative leave from her position as Division Chief of Logistics;

   b. Escorting her out of the building in front of all of her peers;

   c. Cutting off her communications with her co-workers and potential witnesses;

   d. Manufacturing disparaging and untrue complaints against her;

      e.      Allowing disparaging and untrue rumors among staff regarding Ms. Ellis' behavior to grow and disseminate;

      f.      Telling her co-workers, some of whom were her subordinates, that she was being demoted prior to her pre-determination hearing; and

      g.      Demoting her from Battalion Chief to Captain.

74. Defendants' actions constitute a violation of the Utah Protection of Public Employee's Act.

75. Pursuant to U.C.A. § 67-21-6, and as a result of Defendants' actions, each individual defendant is liable for a civil fine of not more than $500 to be paid to the state treasurer for deposit in the General Fund. Additionally, each individual defendant should be dismissed from employment with SLC.

76. Ms. Ellis has been injured as a result of Defendants' actions. Ms. Ellis has suffered and will continue to suffer losses. She is entitled to injunctive relief. She is also entitled to back pay, reinstatement, lost benefits, and interest (both pre and post-judgment).

77. As a further result of Defendants' actions, Ms. Ellis is also entitled to general damages due to her emotional distress, damage due to her reputation, and loss of enjoyment of life.

78. Ms. Ellis is also entitled to recover her attorneys' fees and costs incurred in bringing this action, and any other relief that this Court deems appropriate.

## JURY DEMAND

Ms. Ellis, by and through her counsel, hereby demands a trial by jury of any issue triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Ellis prays for relief and judgment against all Defendants, jointly and severally, as follows:

A. For injunctive relief;

B. For reinstatement;

C. For the payment of lost wages and benefits;

D. For general damages;

E. For consequential damages;

F. For attorneys' fees and costs as allowed by law;

G. For interest (both pre and post-judgment);

H. For an order imposing a civil fine of nor more than $500 upon each individual defendant to be paid to the state treasurer for deposit in the General Fund;

I. For the dismissal of each individual defendant from employment with SLC; and

J. For such further and other relief as the Court deems appropriate.

DATED this 27th day of October, 2016.

                                            **PECK PETERSON, LLP**

                                            By:    /s/ Jaqualin Friend Peterson
                                                             Jaqualin Friend Peterson
                                                             Alex G. Peterson
                                                             Attorneys for Plaintiff Martha Ellis