## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **MARTHA ELLIS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SALT LAKE CITY CORPORATION, a political subdivision of the State of Utah; BRIAN DALE, an individual; KARL LIEB, an individual; and ROBERT McMICKEN, an individual,**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO QUASH OR LIMIT SUBPOENA DUCES TECUM**<br><br><br>**Case No. 2:17-cv-00245-JNP-JCB**<br><br><br>**District Judge Jill N. Parrish**<br><br>**Magistrate Judge Jared C. Bennett** |

District Judge Jill N. Parrish referred this case to Magistrate Judge Paul M. Warner under 28 U.S.C. § 636(b)(1)(A).[1] Due to Judge Warner's retirement, Magistrate Judge Jared C. Bennett was assigned the case.[2] Before the court is Plaintiff Martha Ellis's ("Ms. Ellis") motion to quash or limit a subpoena served on Jacqualin Friend Peterson ("Ms. Peterson") under Fed. R. Civ. P. 45.[3] For the reasons stated below, the court denies Ms. Ellis's motion.

## BACKGROUND

On January 11, 2022, Ms. Ellis served Defendants Salt Lake City Corporation, Brian Dale, Karl Lieb, and Robert McMicken (collectively, "Defendants") with her Supplemental

---

[1] ECF No. 19.

[2] ECF No. 95.

[3] ECF No. 141.

Initial Disclosures in which Ms. Ellis revealed that her prior attorney, Ms. Peterson, would testify as a fact witness. These Supplemental Initial Disclosures provided that Ms. Peterson will testify: (1) "as to the facts and circumstances she personally observed at the time of Ms. Ellis'[s] termination and, more specifically, her efforts to engage in an interactive dialogue with [Salt Lake City] regarding Ms. Ellis's request for reasonable accommodation"; (2) "that Ms. Ellis did not reject a *reasonable* accommodation prior to her termination"; and (3) "that Ms. Peterson had requested a meeting to ask questions about the reasonableness of a proposed accommodation one day prior to the wrongful termination."[4]

When Defendants received Ms. Ellis's Supplemental Initial Disclosures and saw that Ms. Peterson was going to testify about whether Ms. Ellis had rejected a "reasonable accommodation," they understood that to mean that Ms. Peterson was going to provide her opinion that even though the Defendants had offered Ms. Ellis accommodations for her purported disability, those accommodations were not "reasonable." Consequently, Defendants believed that they were entitled to discover the bases for Ms. Peterson's testimony.

Based on this understanding, Defendants' counsel asked Ms. Ellis a series of questions at her deposition specifically seeking information that Ms. Peterson had communicated to Ms. Ellis about the reasonableness of Defendants' offered accommodations and the process to discuss accommodations. Specifically, Defendants' counsel asked:

> **Question**: Did Ms. Peterson tell you that she believed the accommodations offered by the city were not reasonable?
>
> **Answer**: Yes, I do believe she believed that.

---

[4] ECF No. 143-1 at 3 of 3 (emphasis added).

**Question**: What about them did she believe was not reasonable?

**Answer**: I believe she thought the whole proceeding was not reasonable because we couldn't engage in a legitimate conversation about the limitations that the city's mental health care provider put on me held up against what norms been in the fire department and what was being offered.

**Question**: You mean because the city was engaging you in writing?

**Answer**: Well, yeah, that's part of it. . . . But, clearly, there were miscons [sic] and she was bearing witness to me, trying to get a legitimate process going, and she never felt like the process was ever really legitimized because there were so many things slipping through the cracks with just the e-mail communications. And so it was very atypical than the other ADA accommodations discussions I think she had been privilege to engage in prior.

**Question**: Did she tell you that it was very different than the other ADA discussions she had had?

**Answer**: Yes, she did say that this does not—this is not normal, that normally people are much more reasonable and willing to sit down and actually come to some understanding about how to preserve the employee, if it's possible.

**Question**: Did she tell you why she did not believe the accommodations offered by the city were reasonable?

**Answer**: You know . . . she probably did. I mean, we spoke at length about all of this, but I . . . will defer to her because she's going to say in her testimony—I mean—is going to be based on her memory and her recollection of those exchanges, not mine.

**Question**: I understand, but I'm asking you for your memory and recollection of your exchanges with her.

**Answer**: She did not believe that the process was legitimate, and she understood that . . . the actual accommodation that was initially given by Chief Lieb, in comparison to what Gail Szykula put forth—I think that she truly made me feel like—like the process wasn't anything like she had ever experienced before.

**Question**: Did she recommend that you not accept the accommodation offered by the city?

**Answer**: No, she—it was not about that. Those discussions were 100 percent between myself and Gail, because it was about my mental health, it wasn't . . .

3

about the actual procedure as much as it was, well . . . I stand corrected. That is not exactly what I meant to say.

What I mean to say is she was watching the procedure and saying the procedure does not feel like something I've ever seen before. . . . [S]he has seen lots of people come to the table and talk about these things in a reasonable and fruitful and productive way, so she was looking at that aspect of it. But she never told me to decline any of the offers. . . . [T]hat was really more for Gail to measure and . . . evaluate than an attorney.

**Question**: So she wasn't telling you whether or not an accommodation was reasonable?

**Answer**: . . . . She was looking at what Gail had asked for. She was looking at my mental health issues and, yes, she felt like there was a gross miscommunication because the—what was offered with the shadowing position was very incongruent with, you know, the framework under which Gail had requested the accommodation. So her concern was that we need to get here so we're actually talking to each other and clarifying so that we're not completely misfiring over each other and spinning our wheels in a process that is not going to be productive.[5]

Conspicuously absent from the testimony quoted above is an objection based on attorney-client privilege and an instruction to the witness not to answer.[6] Ms. Ellis's counsel stated at oral argument on the instant motion that he declined to object during the deposition because, in his view, Ms. Ellis did not reveal any privileged information.

Based on Ms. Ellis's Supplemental Initial Disclosures and her deposition testimony, Defendants served Ms. Peterson with a subpoena ("Subpoena") under Fed. R. Civ. P. 45. The Subpoena sought: (1) "[a]ll documents and communications related to Ms. Ellis's separation and/or termination from employment with Salt Lake City," and (2) "[a]ll documents related to

---

[5] ECF No. 141-4 at 254-58 of 318.

[6] Fed. R. Civ. P. 30(c)(2) (allowing an attorney to instruct a witness not to answer a deposition question to preserve a privilege).

4

any request for accommodation made by Ms. Ellis to Salt Lake City, including any documents or communications from Salt Lake City pertaining to or responding to such requests."[7]

Ms. Ellis objected to producing the subpoenaed information because doing so would waive her attorney-client privilege.[8] After the parties were unable to resolve the issue on their own, Ms. Ellis moved the court for relief under Fed. R. Civ. P. 45(d)(3)(A)(iii), which requires the court to quash or modify a subpoena that requests "privileged or other protected matter, if no exception or waiver applies."

Defendants contend that even though the subpoenaed materials would otherwise be privileged, a waiver applies because Ms. Ellis placed Ms. Peterson's legal advice at issue in this case and intentionally disclosed that legal advice at a deposition.[9] Because a waiver applies, Defendants argue, Fed. R. Evid. 502(a) requires the production of undisclosed communications between Ms. Ellis and Ms. Peterson dealing with the same subject matter as the communications that have been disclosed and must, "in fairness," be considered together.[10]

Ms. Ellis disagrees and argues that she never waived attorney-client privilege because she never revealed any "confidential" communications with Ms. Peterson in either her Supplemental

---

[7] ECF No. 141-1 at 8 of 8.

[8] Although the Subpoena was served on Ms. Peterson, Ms. Ellis has standing to object to it because she asserts a privilege with respect to the information sought by the Subpoena. *Richards v. Convergys Corp.*, No. 2:05-CV-00790DAK, 2007 WL 474012, at *1 (D. Utah Feb. 7, 2007) ("Generally, a party does not have standing to object to a subpoena issued to a third party, unless the party challenging the subpoena has a personal right or privilege with respect to the subject matter sought by the subpoena." (citing cases)).

[9] ECF No. 143 at 2.

[10] Fed. R. Evid. 502(a)(3).

Initial Disclosures or her deposition. Ms. Ellis's argument is based on the following syllogism: (1) [Major premise] only confidential communications between client and counsel can be privileged; (2) [Minor premise] Ms. Ellis never revealed any confidential communications that she had with Ms. Peterson; and (3) [Conclusion] therefore, she has never waived privilege. In support of her syllogism's minor premise, Ms. Ellis asserts that nothing in her deposition indicates that she learned of Ms. Peterson's opinions through confidential means. Instead, Ms. Ellis claims that Ms. Peterson made Ms. Ellis aware of her opinions in non-confidential ways (e.g., in letters, emails, phone calls, and other communications to Defendants). Therefore, Ms. Ellis contends, she never revealed any "confidential" communication. And because she purportedly never revealed a "confidential" communication with Ms. Peterson, Ms. Ellis did not waive privilege, which precludes the application of Fed. R. Evid. 502(a)'s subject-matter waiver provisions and requires the court to quash the Subpoena.

As shown below Ms. Ellis's argument proves too much for two reasons. First, if the legal advice that Ms. Peterson gave to Ms. Ellis was not confidential, then it cannot be privileged. And if the communications from Ms. Peterson that Ms. Ellis revealed are not privileged, then Ms. Ellis has an obligation to produce them if they meet the relevance and proportionality requirements of Fed. R. Civ. P. 26(b)(1). Second, if Ms. Ellis learned about the legal advice she disclosed in her deposition at least in part from confidential communications that are being requested under the Subpoena, then Ms. Ellis revealed attorney-client communications that require a waiver analysis under Fed. R. Evid. 502(a). As shown in order below, under either Fed. R. Civ. P. 26(b)(1) or Fed. R. Evid. 502(a), Ms. Ellis must produce the subpoenaed documents.

6

## ANALYSIS

I.  **IF MS. ELLIS NEVER DISCLOSED PRIVILEGED INFORMATION, THEN FED. R. CIV. P. 26(b)(1) REQUIRES DISCLOSURE OF ALL NONPRIVILEGED INFORMATION THAT IS RELEVANT TO ANY CLAIM OR DEFENSE AND PROPORTIONAL TO THE NEEDS OF THE CASE.**

Ms. Ellis must produce all nonprivileged materials that are requested in the Subpoena because they are both relevant to the claims and defenses in this action and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1) allows a party to "obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case."[11] As shown below, the court first addresses whether the information Ms. Ellis disclosed in her deposition was privileged. The court then addresses whether the nonprivileged materials responsive to the Subpoena are both relevant to the claims and defenses in this action and proportional to the needs of the case.

    A.  <u>Ms. Ellis Maintains that She Did not Reveal Any Confidential Communications with Ms. Peterson, which Means that None of the Subpoenaed Information is Privileged.</u>

Ms. Ellis's assertion that she never revealed confidential attorney communications during her deposition necessarily requires her to produce those requested in the Subpoena because they would not be privileged either. Although there are varied judicial and scholarly phrasings of the elements of attorney-client privilege, "confidentiality" is a common requirement in all of them.[12]

---

[11] (Emphasis added).

[12] Although there are many iterations of the elements of attorney-client privilege, a well-accepted recitation of those elements is:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that

"Confidential" means, "intended to be kept secret."[13] Not surprisingly, caselaw interpreting this element provides that the attorney-client privilege protects only those communications between an attorney and a client "that are intended to be, and in fact were, kept confidential."[14] Confidentiality of an attorney-client communication "is frequently confused with that of waiver although for purposes of logical clarity it is best to keep the two separate. Confidentiality is what must exist for the privilege to attach at all."[15] Waiver is possible only *after* privilege has attached to the confidential attorney-client communication.

Although Defendants contend that Ms. Ellis waived her privilege, here, Ms. Ellis contends that any information she disclosed in her Supplemental Initial Disclosures and deposition about her communications with Ms. Peterson was not "confidential." Specifically, Ms. Ellis contended at oral argument that she learned about her attorney's views from information that Ms. Peterson disclosed to Defendants and others about the reasonableness of their proposed accommodations and the regularity of the process leading up to Ms. Ellis's termination. Additionally, Ms. Ellis contends that Defendants never bothered to ask questions at Ms. Ellis's deposition regarding whether she learned about Ms. Peterson's views in a private

---

purpose (4) are made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 J. Wigmore, Evidence § 2292, at 554 (McNaughton rev. ed. 1961).

[13] *Confidential*, The Oxford English Dictionary (3d ed. 2004).

[14] *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).

[15] Edna Selan Epstein, *Attorney-Client Privilege and the Work-Product Doctrine*, Vol. 1, III.E3 (2020).

setting that would lead Ms. Ellis to believe that their communications were intended to be secret. Consequently, Ms. Ellis argues, she never disclosed a "confidential" communication with Ms. Peterson and, therefore, did not waive the attorney-client privilege.

Taking Ms. Ellis's argument at face value, she cannot assert attorney-client privilege for any subpoenaed communication with her counsel that is nonprivileged. Instead, Ms. Ellis can only respond one of two ways to the Subpoena: (1) none of the subpoenaed communications discuss the nonprivileged matters that she revealed in her deposition (i.e., Ms. Peterson's views of the reasonableness of Defendants' proposed accommodations and the regularity of the employment-termination process); or (2) there are nonprivileged communications in the subpoenaed materials that discuss the aforementioned topics, but, under Fed. R. Civ. P. 26(b)(1), either they are not relevant to the claims and defenses in this action or producing them is disproportionate to the needs of the case. The court can readily bypass the first possible argument because Ms. Ellis does not claim that the subpoenaed materials are bereft of discussion of the aforementioned topics that Ms. Ellis disclosed in her deposition. Indeed, the court would look with askance at such an assertion given that Ms. Ellis hired Ms. Peterson to provide advice regarding the reasonableness of the Defendants' proposed accommodations as well as the process that eventually led to her termination from employment. Thus, the only possible response left to the Subpoena is under Fed. R. Civ. P. 26(b)(1).[16] But, because Ms. Ellis concedes that she

---

[16] If Ms. Ellis's knowledge of Ms. Peterson's legal advice derives from both confidential and nonconfidential communications, then the issue of whether Ms. Ellis intentionally disclosed information that waived attorney-client privilege becomes relevant. If Ms. Ellis intentionally disclosed information that waived attorney-client privilege, then Fed. R. Evid. 502(a) will require her to disclose the undisclosed communications that deal with the same subject matter as the

learned of Ms. Peterson's advice through nonconfidential means, the only way that Ms. Ellis can avoid producing those nonprivileged communications is by showing that they are neither relevant to the claims and defenses of this action nor proportional to the needs of the case.[17] As shown in the next section, however, Ms. Ellis cannot make that showing.

      B.   <u>All of Ms. Ellis's Nonprivileged Communications in the Subpoenaed Materials Must Be Produced because They are Relevant to the Claims and Defenses in This Action and Proportional to the Needs of the Case.</u>

Given that Ms. Peterson's subpoenaed communications of legal advice to Ms. Ellis were not privileged, Ms. Ellis must produce them under Fed. R. Civ. P. 26(b)(1) because these communications are both relevant to the claims and defenses in this action and proportional to the needs of the case. First, the relevance of these nonprivileged communications cannot be genuinely disputed because Ms. Ellis's Supplemental Initial Disclosures specifically list Ms. Peterson as a witness who will offer testimony "that Ms. Ellis did not reject a *reasonable* accommodation prior to her termination."[18] Ms. Ellis conceded at oral argument that Ms. Peterson's opinion about whether Defendants' proposed accommodations were "reasonable" was identified as an anticipated topic on which Ms. Peterson would testify. And indeed, whether an accommodation is "reasonable" is both the essence of Ms. Ellis's legal claims against Defendants

---

disclosed communications and must, in fairness, be considered together. This is discussed in part II below.

[17] Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . .").

[18] ECF No. 143-1 at 3 of 3 (emphasis added).

and their defenses to Ms. Ellis's claims.[19] Consequently, obtaining documents in which Ms. Peterson discusses her nonprivileged opinions is essential for Defendants to prepare for Ms. Peterson's deposition. These nonprivileged communications are, therefore, relevant.[20]

Second, producing these nonprivileged communications is proportional to the needs of this case. To determine proportionality, Rule 26(b)(1) requires the court to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[21] Determining whether a government entity has discriminated against a person

---

[19] ECF No. 54, ¶¶ 207-18, 212.

[20] To the extent that Ms. Ellis argues that she never intended to have Ms. Peterson testify regarding her legal advice about whether Defendants' proposed accommodations were unreasonable, the record belies that argument. For starters, the text of the Supplemental Initial Disclosures shows that Ms. Ellis intended Ms. Peterson to discuss how Defendants declined meetings with Ms. Peterson. But, in addition to those factual circumstances, Ms. Ellis separately disclosed that Ms. Peterson will discuss the reasonableness of Defendants' proposed accommodations. Had Ms. Ellis intended to limit Ms. Peterson to her attorney interactions with Defendants, the disclosure about reasonable accommodations is superfluous. As further evidence of this reading of the disclosures, if understanding Ms. Peterson's opinion about the reasonableness of Defendants' proposed accommodations and regularity of the employment-termination process were not issues about which Ms. Peterson was to testify, counsel would have objected to questions at Ms. Ellis's deposition asking about those very topics. But Ms. Ellis's counsel did not object to any questions that directly asked for Ms. Peterson's opinion about those matters and, at one point, Ms. Ellis herself said that she would defer to Ms. Peterson's future testimony about her opinions on the reasonableness of the proposed accommodations. All of this shows that Ms. Peterson's opinion about the reasonableness of accommodations and the propriety of the employment-termination process were issues about which Ms. Ellis intended to have Ms. Peterson testify. Ms. Peterson's testimony was not limited to discussing her unrequited meeting requests with Defendants.

[21] Fed. R. Civ. P. 26(b)(1).

based on disability is an important issue, and the amount in controversy is potentially substantial. Both of these factors militate in favor of allowing a higher burden on the producing party.

Ms. Ellis has complete control over the information sought in the Subpoena, and the fact that she designated Ms. Peterson to testify about the reasonableness of Defendants' accommodations indicates that Ms. Ellis believes this information is important to resolving the issues in this action. Both of these factors weigh in favor of tolerating a heavier production burden on the producing party.

Producing this information requires an email search of Ms. Peterson's gmail account, which is not overly burdensome when compared to the importance of the discovery to Ms. Ellis's case and Defendants' need to prepare for Ms. Peterson's deposition. Therefore, Ms. Peterson's communications with Ms. Ellis about the reasonableness of Defendants' accommodations and the propriety of Defendants' employment termination process—which Ms. Ellis concedes are not confidential and, therefore, not privileged—are relevant and proportional under Rule 26(b)(1) and must be produced.

## II.   IF MS. ELLIS LEARNED OF MS. PETERSON'S LEGAL OPINIONS THROUGH CONFIDENTIAL COMMUNICATIONS, THEN MS. ELLIS MUST PRODUCE THOSE COMMUNICATIONS UNDER FED. R. EVID. 502.

Although Ms. Ellis contends that she never disclosed any confidential communications with Ms. Peterson about the reasonableness of Defendants' proposed accommodations and the propriety of their employment termination proceedings, she may discover confidential communications about those topics while complying with the Subpoena. If she discovers confidential communications about those topics, then Ms. Ellis must produce them also because Fed. R. Evid. 502(a) requires it. Rule 502(a) allows a disclosure of attorney-client privileged

information to waive privilege for previously *undisclosed* attorney-client privileged information if the *disclosed* information: (1) occurs in a federal proceeding; (2) intentionally waives attorney-client privilege; (3) concerns the same subject matter as the undisclosed information; and (4) must in fairness be considered together with the undisclosed material. The advisory committee's explanatory note to subdivision (a) of Rule 502 refers to this as a "subject matter waiver" of attorney-client privilege.[22]

To determine whether a subject matter waiver has occurred according to Rule 502(a)'s plain language, the court must consider two categories of information: (1) disclosed information and (2) undisclosed information. The first category of information in this case deals with Ms. Ellis's disclosures in her Supplemental Initial Disclosures and deposition testimony. The second category of information consists of undisclosed communications between Ms. Ellis and Ms. Peterson about various topics, which would normally be entitled to protection under attorney-client privilege. Thus, to determine whether Defendants can access the second category of information, the court must determine whether the disclosures in the first category of information intentionally waived attorney-client privilege for both categories.

The first element of Rule 502(a) is clearly met because the purported disclosures in the first category occurred during this action, which is a federal proceeding. However, the parties hotly dispute the remaining elements of Rule 502(a). Specifically, they dispute whether the disclosure of information in the first category: (1) constitutes an intentional waiver of Ms. Ellis's attorney-client privilege, (2) concerns the same information as the undisclosed information in the

---

[22] Fed. R. Evid. 502 advisory committee's explanatory note to subdivision (a).

second category; and (3) must in fairness be considered together with the undisclosed

information. Issue (1) is discussed first followed by a combined discussion of issues (2) and (3).

A.   Ms. Ellis's Disclosure of Information in the First Category Waived Attorney-
Client Privilege.

Ms. Ellis's disclosures of information from the first category constituted an intentional

waiver of attorney-client privilege. "The attorney-client privilege is lost if the client discloses the

substance of an otherwise privileged communication to a third party."[23] "The proponent of the

attorney-client privilege bears the burden of establishing both that the communications at issue

are privileged and that the privilege was not waived."[24] Therefore, if Ms. Ellis asserts privilege

for any subpoenaed communications touching on Ms. Peterson's legal advice about Defendants'

reasonable accommodations and the termination process, Ms. Ellis must show that she did not

waive privilege. In this action, the disclosure to a third party occurred when Ms. Ellis: (1) listed

Ms. Peterson as a witness who would testify about the "reasonableness" of Defendants' offered

accommodations and its termination process; and (2) revealed her attorney's advice in a

deposition at which Defendants' counsel was present. Each basis for finding waiver is discussed

in order below.

1.   *Ms. Ellis Waived Attorney-Client Privilege by Placing Ms. Peterson's Legal
Advice at Issue.*

By placing Ms. Peterson's legal advice at issue in this action, Ms. Ellis waived attorney-

client privilege. "[A] litigant waives the attorney-client privilege [when] the litigant directly puts

---

[23] *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990).

[24] *United States v. Lewis*, 943 F.2d 58 (Table), 1991 WL 172666, at *3 (10th Cir. Sept. 5, 1991).

the attorney's advice at issue in the litigation."[25] To make this determination, courts consider whether:

> (1) [the] assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to [its] defense.[26]

First, by listing Ms. Peterson as a witness in Supplemental Initial Disclosures to testify about the reasonableness of Defendants' accommodations, Ms. Ellis affirmatively took a litigative action that placed Ms. Peterson's legal advice at issue. Discovery disclosures constitute an "affirmative act."[27] Here, Ms. Ellis deliberately listed Ms. Peterson as a witness who would testify, among other things, about the reasonableness of Defendants' proposed accommodations and the process leading to Ms. Ellis's termination of employment. Designating Ms. Peterson as a witness to testify about these topics was not accident; it was an intentional choice. Therefore, the first condition of waiver is met here.

Second, by taking the affirmative act of listing Ms. Peterson as a witness regarding a critical issue both to Ms. Ellis's claims against Defendants' and their defenses, Ms. Ellis made Ms. Peterson's advice and legal opinions relevant to this case. As discussed above, Ms. Ellis

---

[25] *Frontier Refining, Inc. v. Gorman-Rupp, Co.*, 136 F.3d 695, 700 (10th Cir. 1998).

[26] *Id.* at 701 (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)) (final alteration in original) (emphasis omitted).

[27] *Seneca Ins. Co. v. W. Claims, Inc.*, 774 F.3d 1272, 1274, 1277-78 (10th Cir. 2014) (finding that party's discovery disclosure of attorney advice was a deliberate act that resulted in loss of privilege by placing it at issue).

believes that Ms. Peterson's testimony is relevant to the issue of "reasonable accommodation," which is central to resolving both Ms. Ellis's claims against Defendants' and their defenses in this action. Thus, Ms. Ellis made Ms. Peterson's advice relevant to this action.

Finally, applying privilege to Ms. Peterson's legal advice would deny Defendants access to information that is vital to their defense. To be "vital" to a party's defense, the information sought must be more than "relevant" and not available from any other source.[28] Here, if Ms. Ellis is going to have Ms. Peterson testify about why she believed that Defendants' proposed accommodations were not "reasonable" in addition to finding fault with other facets of the employment-termination process, then the only way Defendants can adequately prepare to cross-examine Ms. Peterson's testimony is to understand the information that Ms. Ellis provided to Ms. Peterson and the advice that Ms. Peterson gave back based on that information. Even if the court assumes that every piece of legal advice on these topics that Ms. Peterson rendered to Ms. Ellis is publicly available, the facts that Ms. Ellis gave to Ms. Peterson are not. Consequently, having the communications between Ms. Ellis and Ms. Peterson are vital to Defendants being able to defend against claims that they failed to provide reasonable accommodations or otherwise erred in the process of terminating Ms. Ellis's employment. Therefore, by designating Ms. Peterson as a witness to testify about the reasonableness of Defendants' proposed accommodations and the irregularity of the termination process, Ms. Ellis deliberately placed her attorney's advice at issues, which is an intentional waiver of attorney-client privilege.

---

[28] *Frontier Refining, Inc.*, 136 F.3d at 701 ("Mere relevance, however, is not the standard . . . . Instead, the information must also be 'vital,' which necessarily implies the information is available from no other source.").

*2. Ms. Ellis's Deposition Testimony Waived Attorney-Client Privilege.*

Ms. Ellis's deposition testimony intentionally waived attorney-client privilege on the topics of whether Defendants' proposed accommodations were reasonable and about the regularity of the process that resulted in Ms. Ellis's termination from employment. A waiver of attorney-client privilege occurs when "the client discloses the substance of an otherwise privileged communication to a third party."[29] Disclosing confidential attorney-client communications to the opposing party at a deposition is precisely the type of third-party disclosure that waives attorney-client privilege.[30]

Ms. Ellis intentionally disclosed her attorney's advice to her regarding the reasonableness of Defendant's proposed accommodations and the propriety of Defendants' procedures resulting in Ms. Ellis's termination from employment. For example, Defendants' counsel specifically asked Ms. Ellis whether Ms. Peterson believed that Defendants' proposed accommodations were unreasonable, and Ms. Ellis answered that Ms. Peterson so believed.[31] Defendants' counsel then

---

[29] *Ryans*, 903 F.2d at 741 n.13.

[30] *See, e.g.*, *Owens v. QVC*, 221 F.R.D. 430, 432 (E.D. Pa. 2004) ("At her deposition, Ms. Mason disclosed privileged communications to a third party i.e., all persons present at the deposition. Because she disclosed the communication to third parties, Ms. Mason waived her right to keep her previous communications with Mr. Rich confidential." (footnote omitted)).

[31] Ms. Ellis said that she "believed" that Ms. Peterson "believed" that the proposed accommodations were unreasonable. Ms. Ellis now contends that she was speculating rather than revealing privileged information. This argument is unpersuasive. The only way that Ms. Ellis would know what Ms. Peterson believed is through communications with Ms. Peterson. As stated above, if Ms. Ellis learned of Ms. Peterson's belief on this topic through nonconfidential means, then Rule 26(b)(1) requires her to produce those nonprivileged communications. But, if Ms. Ellis learned of Ms. Peterson's belief through confidential communications, Ms. Ellis waived attorney-client privilege protection of those confidential communications by intentionally disclosing their substance.

asked several follow-up questions to further understand what Ms. Peterson told Ms. Ellis about the reasonableness of Defendants' proposed accommodations. Although Ms. Ellis said that she would defer to Ms. Peterson's answers, Ms. Ellis provided some detail about what Ms. Peterson had told her about both the accommodations' purported unreasonableness and the irregularity of the proceedings that resulted in the termination of Ms. Ellis's employment. By disclosing Ms. Peterson's views—and assuming there are confidential communications discussing the reasonableness of Defendants' proposed accommodations and irregularity of the process leading to Ms. Ellis's termination from employment—Ms. Ellis waived attorney-client privilege regarding those communications.[32] Additionally, for purposes of Rule 502(a), this waiver was intentional because no objection for privilege preceded Ms. Ellis's responses to questions that were clearly requesting communications between her and her attorney. Therefore, Ms. Ellis's deposition disclosures constitute an intentional waiver of attorney-client privilege.

B. Confidential Communications About the Reasonableness of Defendants' Accommodations and the Irregularity of the Process Resulting in Ms. Ellis's Termination Must be Produced and Considered Together In Fairness with the First Category of Information.

Assuming that confidential communications exist between Ms. Ellis and Ms. Peterson in the subpoenaed materials, Ms. Ellis must identify any of those communications that discuss: (1) the reasonableness of Defendants' proposed accommodations, and (2) the regularity of the process resulting in Ms. Ellis's termination from employment. After identifying these communications, Ms. Ellis must disclose them because they should be considered "in fairness"

---

[32] *In re Qwest Communications Intern. Inc.,* 450 F.3d 1179, 1185 (10th Cir. 2006).

with that which has already been disclosed.[33] The Advisory Committee's Explanatory Note accompanying Rule 502 provides that one of the evils that Rule 502(a) sought to rectify is when "a party intentionally puts protected information into the litigation in a selective, misleading, and unfair manner."[34] Thus, "[i]f a party discloses only a portion of privileged or protected information that is helpful to its litigation position, while concomitantly refusing to disclose harmful privileged or protected information relating to the same subject matter, such 'selective' disclosure would be both misleading and unfair."[35]

Ms. Ellis's intentional disclosures would unfairly air Ms. Peterson's viewpoints that are favorable to Ms. Ellis's claims and critical of Defendants without allowing Defendants to adequately prepare to cross-examine Ms. Peterson or to determine the scope of her knowledge. In other words, not allowing Defendants to consider any confidential information about Ms. Peterson's forthcoming testimony would allow Ms. Ellis to use Ms. Peterson's confidential legal advice as a sword to further her case while using attorney-client privilege as a shield to prevent Defendants from being able to adequately deal with Ms. Peterson's testimony. That is unfair. Therefore, in fairness, the confidential communications sought under the Subpoena and the matters previously disclosed in the first category of information must be considered together.

---

[33] Fed. R. Evid. 502(a)(3).

[34] Fed. R. Evid. 502 advisory committee's explanatory note to subdivision (a).

[35] Paul W. Grimm, Lisa Yurwit Bergstrom, Matthew P. Kraeuter, *Federal Rule of Evidence 502: Has it Lived Up to Its Potential?*, 17 RICH. J. OF LAW & TECH., no. 3, 2013, 1, 22.

## CONCLUSION AND ORDER

For the reasons explained above, the court finds that Ms. Ellis must produce the communications sought under the Subpoena that discuss the reasonableness (or lack thereof) of the accommodations that Defendants proposed to Ms. Ellis and the regularity (or lack thereof) of the employment-termination process that Defendants provided to Ms. Ellis. Ms. Ellis must produce all communications on these subjects regardless of whether they are confidential.

For attorney-client communications that address subjects beyond the scope of what the court has deemed waived, Ms. Ellis may assert privilege for those unwaived subjects and may decline to produce those communications. If attorney-client communications discuss both waived and unwaived subjects, Ms. Ellis must redact the privileged portions where possible and produce them for what they reveal about the subjects for which privilege has been waived. However, if Ms. Ellis redacts portions of a communication or if she withholds an entire communication, she must comply with Fed. R. Civ. P. 45(e)(2)(A) by providing Defendants with a privilege log. If Defendants believe that additional documents must be disclosed, the parties must meet and confer. If that meet and confer is unavailing, either party may file for appropriate relief under Rule 45. For the reasons stated, Ms. Ellis's motion to quash or limit the Subpoena is DENIED.

DATED this 15th day of April 2022.

BY THE COURT:

JARED C. BENNETT
United States Magistrate Judge

20