IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARTHA ELLIS,<br><br>                    Plaintiff,<br><br>v.<br><br>SALT LAKE CITY CORPORATION; KARL LIEB; BRIAN DALE; and ROBERT McMICKEN<br><br>                    Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-00245-JNP-JCB<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

Before the court is a motion for summary judgment filed by Defendants Karl Lieb ("Lieb"), Brian Dale ("Dale"), Robert McMicken ("McMicken") (collectively, the "Individual Defendants"), and the Salt Lake City Corporation ("Salt Lake City" or the "City"). ECF No. 150. This dispute arises from Plaintiff Martha Ellis's ("Ellis") claim that Defendants violated Title VII and 42 U.S.C. § 1983 by discriminating and retaliating against her because of her sex, and violated the Americans with Disabilities Act ("ADA") by failing to accommodate her disability, as well as discriminating and retaliating against her because of her disability. The court held an in-person hearing regarding this motion on March 22, 2023. After considering the parties' written submissions and oral arguments, the court DENIES Defendants' motion for summary judgment.

## FACTUAL BACKGROUND

Martha Ellis joined the Salt Lake City Fire Department ("SLCFD" or the "Department") as a firefighter in 1994. Thereafter, she quickly moved up the ranks. In 2004, she was promoted to Fire Captain and served as the Fire Marshal for the Salt Lake City International Airport. In 2009, she was promoted to Battalion Chief and assigned the prestigious posts of City Fire Marshal and

Fire Prevention Bureau Division Chief. She served in this capacity until 2014. As Ellis progressed through the Department, she collected accolades and acclaim. In addition to her associate degree in fire science, she earned a master's degree in national security studies from the Naval Postgraduate School, a fellowship to study at the Harvard Kennedy School's Senior Executives in State and Local Government Program, and a graduate certificate in conflict resolution and mediation from the University of Utah. She was also the most decorated female officer in a fire department sorely lacking women in leadership roles. Ellis received a Golden Spanner Award in 1996, a Chief's Certificate of Merit in 2005, and the Chief's Recognition Medal in 2011.

In late 2013, Deputy Chief Brian Dale became Ellis's direct supervisor. Dale quickly set up a meeting with Ellis to discuss his expectations for their relationship. At this meeting, Dale allegedly made a "comment about taking [disgruntled employees] outside the office or something along those lines and handing them a tampon." ECF No. 151-9 at 42:7-10. He also referred to a female dispatcher as a "mean ass, crazy police bitch," and a female accountant for the City as a "bitch." ECF No. 54 at ¶ 45.

Within several weeks of their initial meeting, Dale began criticizing Ellis's alleged lack of adherence to the chain-of-command. Specifically, in an email exchange, Dale complained to Ellis that she was bypassing him to discuss issues directly with the Chief of the Department, Kurt Cook ("Cook"). ECF No. 151-32. At this time, Cook and Ellis were personal friends. The next day, January 10, 2014, Dale and Ellis met to discuss Ellis's insubordination. Unbeknownst to Dale, Plaintiff recorded their conversation, as she often did with other men in the Department. At the meeting, Ellis agreed to include Dale on emails to Chief Cook going forward and the conversation moved on to Ellis's strained relationship with the City's grant writer. Responding to Ellis's frustration with the grant writer, Dale stated that "Sarah [the employee] can be a real bitch." ECF

No. 33. Ellis responded, "But you know what? The bitchier the women, the more I actually like 'em. I mean I love Mary Beth. I really like working with her."[1] *Id*. Plaintiff also testified that during the conversation, Dale made a comment about throwing tampons at employees and that she made it clear to Dale that his comments were offensive and unwanted. ECF No. 151-9 at 50:5-9. Plaintiff does not deny that she has used the words "bitch," "bitchy," or "bitchier," but she maintains that she has never used them in a way that was hostile towards women. ECF No. 151-9 at 46:4-17.

On February 6, 2014, Dale issued Plaintiff a written warning, allegedly to address Plaintiff's flagging performance due to her disregard for the Department's chain-of-command. ECF No. 151-36. While Dale maintained that this warning was not disciplinary, Ellis believed that the warning was "a marker being placed in [her file] in the hopes of keeping [her] from ever getting promoted again." *Id*. at 65:22-24. Later that month, Dale met with Plaintiff and the Department's HR consultant, Jennifer Sykes ("Sykes"), to discuss the warning. During this meeting, Dale complained about Ellis's leadership, her supervision of subordinates, and her communication with individuals both inside and outside of the Department. Dale and Ellis also engaged in the following exchange when Dale attempted to encourage Plaintiff to better connect with lower-rank Fire Captains:

> Dale: We talked about relationships. We talked about I want you to get out there in front. Talked about at the grass[root] level, this is what you can do. As a captain, this is what I'm seeing -- boom, boom, boom -- this is how you do it. "God, she can do it. If a girl can do it, I mean --" You know how guys are out there. If we sit up here in the ivory tower and talk above their heads—
>
> Plaintiff: [Laughs] Yeah, he just said that. [Laughs] Sykes: [Inaudible]
>
> Dale: I just--I just--You know--I don't want the guys to think that you're -- that you and I are just miserable day workers. I think there is some value in getting in there

---

[1] Mary Beth was a woman employed by Salt Lake City.

with those guys and being able to talk to 'em and understanding what they're going through. That's all.

Plaintiff: All right.

ECF No. 151-34.

Ellis wrote and submitted a response to Dale's written warning, as was her right, arguing that the allegations contained in the warning were false. ECF No. 151-37. She also detailed specific instances in which she was subject to verbal abuse and discrimination by members of the Department. In her deposition, Plaintiff testified that she believed the written warning was a result of gender discrimination for the following non-exhaustive reasons:

1. She "did not feel like [she had] had any formal coaching or counseling, nor did [she] feel like any of that was documented. [She] felt like it was a blind side. [She] literally had no idea this was coming."
2. Dale instructed her to issue a written warning to a female employee regarding e-cigarettes after she had received a verbal warning, which Ellis believed was trivial. Dale did not request that she write up men for similar violations. This led her to believe that the women in the SLCFD "were taking a hit at this point."
3. Dale's comment that "If a girl can do it, I mean--' You know how guys are out there."
4. She had previously been written up for things that "kind of don't make a lot of sense."
5. "[G]uys would keep getting the get-out-of-jail-free cards and, you know, the rules were different for the women."

ECF No. 151-9 at 63:2-70:19. Ellis also believed that the warning was retaliatory because she had previously complained about the sexist behavior of men in the Department to Melissa Green ("Green"), the City's EEO manager. Green "had [possibly] said something to these guys about, you know, my initial visit with her." *Id*. at 71:15-72:14. Plaintiff thought that "there weren't a lot of [other] explanations for why all of the sudden it really felt like those micro aggressions had now transferred into a full court press." *Id*.

On September 30, 2014, Chief Cook promoted Robert "Rusty" McMicken to the position of Administrative Assistant Chief. Ellis had hoped to receive this promotion. Like Ellis, McMicken

joined the Department in 1994 as a firefighter. He then served as a Captain before receiving a promotion to Battalion Chief in 2010. McMicken served as Battalion Chief of Logistics from 2012 until he was promoted to Administrative Assistant Chief. Despite McMicken's similar rank to Ellis in 2014, she believed that he was less qualified than she based on her "extraordinary efforts to get additional training," her "much broader understanding of the fire department as a whole," her work at the "national level," and her recently obtained degree in national security studies. *Id.* at 2:21- 84:17.

Soon after learning that she would not receive the promotion to Assistant Chief, Ellis requested to meet with Chief Cook regarding the decision. Cook invited Dale and Karl Lieb, a Deputy Chief of the Department, to the meeting, explaining to Ellis that he operated "as one" with Dale and Lieb. ECF No. 151-42. At the meeting, Plaintiff stated that she believed that the decision not to promote her had "a bit to do with, um, well -- I think the fact that I'm a woman has something to do with it. I will throw that out there." *Id.* Cook responded:

> That's really fascinating actually because that's not the case at all. I'll be straight up with you, it's about--it's about team chemistry. And I think what you illustrated by wanting to meet with me individually is representative of some of that. And I think it is a matter of confidence in being able to sit down and [inaudible] issues and have those discussions and work together as a cooperative or collaborative team. And I just haven't felt that.

*Id.* Ellis later testified that Cook also complained to her that, "you come in here, you know, making these allegations that you're not getting promoted because you're a woman . . . That's just bullshit." ECF No. 151-9 at 89:7-17. Additionally, she maintained that when she stated that she had been discriminated against, Cook became "physically agitated and uncomfortable, shifting in his seat." *Id.* at 89:1-6. Moreover, during the meeting, Lieb explained that Ellis was not promoted, in part, because he believed that she was not "humble enough." *Id.* at 91:22. In response to this criticism,

Plaintiff contends that there were "several times in [her] interview when [she] actually own[ed] up to [her] mistakes." *Id*. at 91:22-25.

In October 2014, Cook removed Plaintiff from her position as Fire Marshal and appointed her as the new Division Chief of Logistics. While her rank, pay, and benefits did not change, Ellis interpreted her transfer as a demotion because her responsibilities were reduced. According to Ellis, the fire marshal position is . . . often referred to as the alter ego of the fire chief. It's a very revered position, it's a very high profile position." *Id*. at 94:16-96:2. When this role was taken from her, she received a smaller staff and less influence in the community. Cook justified his decision by arguing that Ellis had outgrown her role as Fire Marshal and that this new position would bring her closer to his administration.

On November 24, 2014, Plaintiff filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). ECF No. 41-1. Ellis's Charge indicated that the Department had discriminated and retaliated against her because of her gender. It alleged that Dale had singled her out for punishment and made several derogatory comments towards her and other women in the Department based on their gender. It also complained that she was unjustly passed over for promotion multiple times and reassigned to a lesser position against her will. On March 16, 2015, Ellis sent a letter to the EEOC updating this Charge. ECF No. 43-1. Her amendment focused on the conduct of her new supervisor, Assistant Chief McMicken. Ellis claimed that since the filing of her initial Charge, McMicken had denied her networking opportunities, unjustifiably scrutinized her performance, and made defamatory statements about her work.

On April 27, 2015, McMicken delivered a pre-determination letter to Ellis. ECF No. 151-45. The letter informed her that he was considering disciplinary intervention because she was exhibiting "an apparent lack of engagement with [her] current assignment, a lack of ownership of

[her] job responsibilities, an inability to follow instructions[,] and a lack of respect for [her] chain of command." *Id*. The Department eventually held a hearing on this complaint in June 2015, after which McMicken decided to suspend Ellis for two days. ECF No. 151-46.

On April 7, 2015, Cook announced his retirement, effective April 30, 2015. On April 28, 2015, two days before Cook was to step down, Plaintiff sent an application for the Fire Chief position to Mayor Ralph Becker. At this point, Mayor Becker had not formally posted a call for applications. In response to her application, the Mayor's Chief of Staff, David Everitt ("Everitt"), informed Ellis that Mayor Becker had already selected a new Fire Chief. Upon hearing this news, Plaintiff offered to speak with the Mayor about the EEOC Charge pending against the Department's leadership—the very set of individuals who she assumed had been considered for Fire Chief. Everitt declined the invitation, stating that he believed a direct meeting with the Mayor was "not advisable" since Ellis's Charge was also pending against the City. ECF No. 44.

On May 4, 2015, the Mayor announced that Dale was to become the new Fire Chief. His tenure would be a short one because audio of his use of gendered language was leaked to the press. ECF No. 160-2 at 21:24-22:12. Everitt later testified that Plaintiff was not a serious contender for the role of Fire Chief because "she had been considered at one point much earlier in the mayor's tenure and quickly ruled out as a potential candidate at that point." ECF No. 151-35 at 11:14-13:18. Everitt maintained that Ellis was not competitive because she was "in some cases abrasive and off putting in others." *Id*. Everitt believed that Ellis "was a nightmare in her role as Fire Marshal" since "she was difficult to work with, . . . at times was not very present or responsive, and just broadly did not seem to have the level of respect and trust that someone in that role should have had for the city." *Id*. at 20:4-17.

In response to both McMicken's discipline and Dale's promotion, Plaintiff once again amended her EEOC Charge. In a letter to the EEOC dated May 5, 2015, Ellis alleged that McMicken's unwarranted complaints and controlling behavior had reached the point where they constituted a hostile work environment. ECF No. 43-2. She also argued that the reason she had been issued a pre-determination notice in April was to prevent her from being considered for the Fire Chief position that eventually opened that May. *Id.*

On May 22, 2015, Plaintiff sent the Department's EEO Manager, Green, an e-mail with allegations regarding Cook, Dale, Lieb, McMicken, Human Resources Director Debra Alexander, and Sykes. ECF No. 151-51. Thereafter, four Department employees submitted evidence supporting Ellis's claim that members of the Department's leadership team, specifically Dale, regularly used sexist language. On August 3, 2015, Captain Steve Hoffman ("Hoffman") told Green that Dale had said on multiple occasions that "he did not like [Battalion Chief] Ellis," that he "wrote her up" and was "finally going to hold her accountable," and that he "really hate[d] that bitch." ECF No. 160-4 at 45:21-46:5. On August 31, 2015, Brittany Blair ("Blair") told Green that she witnessed a meeting with Dale, Lieb, and McMicken where Dale called Ellis "a bitch." *Id.* at 50:3-13. On October 20, 2015, Sarah Bohe ("Bohe") spoke with Green and stated that while Dale was describing projects that he was working on, he had said, "Oh that fucking bitch is making it so hard," referring to Ellis. *Id.* at 36:6-14. And on November 2, 2015, Crystal VanDongen ("VanDongen") spoke with Green and alerted her to the fact that she "had been discriminated against based on [her] gender, been subjected to a hostile work environment and been retaliated against based on [her] affiliation with Battalion Chief Martha Ellis." ECF No. 160-14. VanDongen explained to Green that she had heard Dale refer to several women as bitches. *Id.* Additionally, she alleged that McMicken and Lieb had made offensive comments regarding women. *Id.*

Green prepared a 24-page report detailing her findings and, on November 18, 2015, determined that the available evidence did not support Plaintiff's allegations that she was disciplined, transferred, treated differently, or not promoted based on her gender. ECF No. 151-52. It also found that the allegations against Dale were insufficiently supported to substantiate a policy violation even though several members of the Department had come forward to complain that Dale had used misogynistic language to refer to Ellis and other women in the Department.

In January 2016, the Department promoted Clair Baldwin ("Baldwin") to Assistant Chief of Operations. Plaintiff had hoped to receive this promotion. Baldwin had joined the Department in 1985, serving in the Operations Division as a firefighter. He was a paramedic, Fire Captain, and Battalion Chief before being promoted to Division Chief of Medical Services, where he served for more than three years until his next promotion to Assistant Chief.

On March 16, 2016, McMicken issued Ellis a second pre-determination notice. This notice informed Ellis that McMicken had once more observed a "a pattern of performance" that caused him "to question [her] ability to effectively manage and perform [her] job duties." ECF No. 151-47. By this time, McMicken was certainly aware that Ellis had filed an EEOC complaint against him. ECF No. 160-7 at 43:7-11. On April 11, 2016, the City held a pre-determination hearing regarding Ellis's job performance, and on May 3, 2016, she was demoted to Captain. ECF No. 151-50. After her demotion, the Department allowed Ellis to select her next job from two available Captain positions: (1) Apparatus Captain in the Logistics Division, or (2) Station Captain in the Operations Division. Plaintiff selected the Operations Captain position because it would allow her to avoid reporting directly to McMicken. ECF No. 151-9 at 233:20-22.

On May 13, 2016, Plaintiff requested Family Medical Leave Act ("FMLA") leave as a result of her declining mental health. By this point, Ellis was allegedly experiencing severe anxiety

due to the hostile work environment that she had faced for the past several years. According to her treatment provider, Gail Szykula ("Szykula"), Ellis requested leave because she would likely have difficulty planning, organizing, managing responsibilities, and managing emergency response for twelve weeks. ECF No. 151-1. The City granted Ellis's first request for FMLA leave through August 26, 2016. After these twelve weeks of leave, Plaintiff had exhausted all of the FMLA leave that she was entitled to under the Department's FMLA policy. ECF No. 151-3.

While on FMLA leave, Plaintiff once more amended her EEOC Charge. ECF No. 43-3. In this final letter to the EEOC, dated July 8, 2016, Ellis detailed the ongoing alleged discrimination and retaliation that she was experiencing, naming McMicken, Lieb, and Dale as the primary culprits. In addition to continuing to attempt to redress her situation through the EEOC process, Plaintiff also turned to the Salt Lake City Civil Services Commission ("CSC") for relief. ECF No. 160-1. The CSC had the power to determine whether City agencies had violated the City's employment policy. At some point during her leave, Ellis submitted an appeal of her May 2016 demotion to this body.

On August 15, 2016, prior to the expiration of her FMLA leave, Plaintiff requested a full-time Director's leave of absence from then-Chief Dale. ECF No. 151-4. In her request, Ellis indicated that she was hopeful that she could return to the Department "within a few months." *Id*. Dale granted this request and permitted Ellis to take leave through November 26, 2016. *Id*. But Plaintiff did not return to work in November. Instead, on November 18, 2016, she requested additional Director's leave, this time from the new Chief, Lieb. Lieb granted Ellis leave through February 28, 2017. ECF No. 151-5.

On January 31, 2017, Szykula informed the City that she anticipated Ellis would return to work on March 1, 2017. ECF No. 151-6. But on February 17, 2017, despite Szykula's initial

representations, Ellis requested Director's leave for a third time. ECF No. 151-8. Specially, she asked for leave until her CSC appeal was resolved because she was still "suffering from mental health disorders that ha[d] an adverse impact on [her] psychological wellbeing and cognitive capabilities that [we]re exacerbated with stress." ECF No. 151-13. Lieb denied Ellis additional leave and ordered that she return to return to work on March 1, 2017. ECF No. 151-8. At this point, Plaintiff felt as though she was "being forced back to work" even though she was not entirely ready. ECF No. 151-13.

When Ellis returned to the office, she was slated to start her new role as a Station Captain in the Operations Division. In this capacity, Captains work shifts referred to as a "48/96." This schedule requires Captains to spend 48 consecutive hours on-duty and then 96 consecutive hours off-duty. The essential duties of a Captain in Operations are as follows:

1. Leadership and Personnel Management: Plans and directs the activities of assigned crew/division/section.
2. Emergency Response and Preparedness: Ensures that assigned employees, apparatus, equipment and facilities are maintain[e]d in readiness to respond to emergencies. Ensures safe and timely response to all emergencies.
3. Safety: Ensures the safety of the public and all assigned employees, apparatus and equipment in accordance with department policies.

ECF No. 151-10. The position also requires "[e]xtensive knowledge of modern principles and tactics used in fire suppression," and the "ability to make decisions under emergency and non-emergency situations." *Id*. Working conditions entail "[c]onsiderable exposure to stressful situations." *Id*.

Initially, the essential duties of serving as a Station Captain were likely beyond Plaintiff's capabilities, both because she was rusty after many years working outside of operations and because her mental health was fragile. Still, Ellis did not believe that the work would be beyond her capabilities so long as she was granted some accommodations. To ease her return to work, on

February 22, 2017, Plaintiff informed the City that her healthcare provider would submit an ADA accommodation request related to "training and gradual assimilation into my operations role." ECF No. 151-14. On February 23, 2017, Szykula submitted a letter recommending Plaintiff "return to work initially on a part-time basis, in a light duty capacity, until she has received training on the skills specific to her current assignment's roles and responsibilities." ECF No. 151-15. "Once this training [was] completed," Szykula believed that Ellis "could assume the operations role that has been designated for her and over the course of several weeks, gradually increase her hours to full time status." *Id*. On February 26, 2017, Ellis followed up with Green to clarify whether the City would grant her the accommodations that she had requested. In this message, Ellis explained that her healthcare provider had recommended that she initially be assigned "a 20-hour workweek in the training division for the duration of the current recruit class (approximately 5 weeks) plus time to have a department physical and an opportunity to run through the department Task Performance Test." ECF No. 151-16.

On February 27, 2017, Green, who handled the City's ADA accommodations, requested clarifications from Szykula, including information about what a "part-time basis" in a "light duty capacity" would entail. ECF No. 151-17. Green also postponed the March 1 deadline for Ellis's return to work and asked Szykula to provide more information about Ellis's work limitations. *Id*. Syzkula responded to Green's requests in a letter dated March 6, 2017. She stated that Ellis was initially limited to twenty hours of work per week and "work outside emergency operations." ECF No. 151-12. She also noted: "It is my recommendation that Ms. Ellis be an observer in the Training Department for the first two to three weeks. She can then work with her supervisor in that department to increase her participation, as she feels comfortable." *Id*. The same day, Green responded to Syzkula's letter by informing Ellis that, while the Department could not place her in

the Training Division as requested, it would accommodate her needs by allowing her to gradually

return to work by shadowing an Operations Captain as "an observer" with "no responsibility for

the crew or the calls." ECF No. 151-18. In this capacity, she would be limited to two ten-hour

shifts per week for thirty days. Green alternatively offered to look into transferring Plaintiff to

another position with the City.

On March 8, 2017, Syzkula followed up with Green to offer more detail about Ellis's work

limitations. She indicated that Plaintiff still exhibited the following unresolved limitations:

1. Manage Multiple Priorities: Severe Limitation
2. Intense Customer Service: Severe Limitation
3. Multiple Stimuli: Severe Limitation
4. Frequent Change: Moderate Limitation
5. Short-term Memory: Moderate Limitation
6. Attention Span: Moderate Limitation

ECF No. 151-19. Syzkula did not believe that these issues were permanent. Rather, she stated that

they would "improve w/ [sic] appropriate accommodations." *Id*. The letter also clarified that Ellis

requested an accommodation to initially work on four, five-hour, days each week, instead of two,

ten-hour days each week. *Id*. at 3.

In response to the additional information provided by Syzkula, on March 9, 2017, Green

informed Ellis that the Department now believed that there were no reasonable accommodations

that would allow her to return to work as a Station Captain in Operations. ECF No. 151-20.

According to Green, Plaintiff's limitations were too severe to serve in this position. She instead

offered to help move Plaintiff out of the Department to another position in City government. On

March 13, 2017, Ellis responded by insisting that she be allowed to work in the Department. ECF

No. 151-11. She also stated that while she was still struggling with her mental health, her condition

was merely "episodic" and she wanted to get back to work. *Id*.

On March 14, 2017, Green once again explained that the Department would not offer Ellis any accommodations. ECF No. 151-21. She justified this decision primarily by arguing that Plaintiff had severe work limitations that would continue for an unknown amount of time. That same day, Ellis replied to Green and attempted to explain that her work limitations were temporary and that she hoped to increase her responsibility only two weeks after beginning her new assignment. ECF No. 151-22. Green responded the next day by reiterating that she would not allow Plaintiff to return to the Department. *Id*. On March 16, 2017, Ellis made a last-ditch effort to argue for accommodations, explaining that, at maximum, she would need four to six weeks to return to work in a full capacity. ECF No. 151-23. Then, on March 17, 2017, Green sent Ellis a letter summarizing their discussion and affirming that the Department could not offer her any accommodations. ECF No. 151-24. Soon thereafter, Chief Lieb informed Ellis that he was terminating her employment due to "your unavailability to return to work at this time." ECF No. 151-25.

While Ellis was on leave and her negotiations over accommodations with the Department were ongoing, her CSC appeal moved forward. In early February 2017, the CSC held a two-day hearing to determine the outcome of the appeal. ECF No. 160-1. Ellis, McMicken, and representatives of the SLCFD were all present and represented by legal counsel. Each side called witnesses to offer testimony on direct and cross-examination. On March 18, 2017, the three member CSC met and unanimously voted to overturn and reverse Ellis's demotion. The CSC ultimately found that:

1. "McMicken was looking for reasons to discipline Ellis." *Id*. at 24.
2. "[A]llegations of Ellis' lack of performance are not supported by substantial evidence." *Id*. at 26.
3. The reasons for Ellis's demotion were "trivial in nature." *Id*.

4. The "allegations appear to the Commission to be an attempt to manufacture misconduct and allege failure of performance to justify the disciplinary action, when there were no performance issues." *Id*. at 39.

Although the CSC overturned Plaintiff's demotion, the Department never restored Ellis to her original position or reinstated her, since by this time her employment had been terminated. Ultimately, she was only paid the salary that she lost due to her demotion—$7,166.74.

After the Department terminated Ellis, she continued to receive long-term disability benefits from Aetna, her long-term disability insurance provider. On October 25, 2017, Aetna determined that Ellis no longer met the contractual definition of "disabled" and terminated her benefits. This decision occurred soon after a phone call between an Aetna representative and Ellis. During this conversation, the Aetna representative asked, "Is there any chance you are in a lawsuit with Salt Lake City?" ECF No. 151-2 at 182:24-25. When the Plaintiff confirmed that she was in a legal dispute with the City, the representative stated, "Oh, that explains a lot." *Id*. at 183:3-6. Two months after Aetna's termination of benefits, the company reversed its decision and reinstated Ellis's benefits. ECF No. 151-27.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

### I.   STATUTES OF LIMITATION

As an initial matter, Defendants argue that Ellis's Title VII claims pertaining to events prior to January 29, 2014[2] and her § 1983 claims pertaining to events prior to January 11, 2014[3] are barred by the statute of limitations for each cause of action. Ellis agrees with this conclusion and clarifies that the court should solely use evidence regarding conduct prior to these dates as context for her non-time barred discrimination and retaliation claims. The court accepts this analysis by the parties, though it ultimately does not impact the outcome of this motion for summary judgment.

### II.   ADA CLAIMS

Under Title I of the Americans with Disabilities Act, "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This language creates several potential causes of action for plaintiffs with disabilities. *Detterline v. Salazar*, 320 F. App'x 853, 856 (10th Cir. 2009). Here, Ellis claims that Salt Lake City violated the ADA by (i) denying her reasonable requests for accommodations, (ii) terminating her employment because of her disability, and (iii) taking adverse employment action against her in retaliation for engaging in protected activity. *See e.g.*, *Edmonds-Radford v. Sw. Airlines Co.*, 17

---

[2] A plaintiff must exhaust her administrative remedies by filing a charge with the EEOC no more than 300 days after the conduct in question in order to maintain a Title VII claim. *Jensen v. West Jordan City*, 968 F.3d 1187, 1203 (10th Cir. 2020). Plaintiff filed her first EEOC charge on November 25, 2014. Thus, any conduct prior to January 29, 2014, is time-barred.

[3] The statute of limitations for § 1983 claims is 4 years. *See Henrie v. Carbon Sch. Dist.*, No. 2:19-CV-00732-DAK, 2022 WL 280799, at *9 (D. Utah Jan. 31, 2022). Plaintiff filed her § 1983 claims on January 11, 2018. Thus, she may not base these claims on conduct prior to January 11, 2014.

F.4th 975, 1120 (10th Cir. 2021). The court examines each claim in turn, grouping discussion of Plaintiff's "discrimination" and "retaliation" claims for the sake of efficiency.

## A.  FAILURE TO ACCOMMODATE

To establish a failure to accommodate claim under the ADA, a plaintiff must show that "she (1) is disabled, (2) is otherwise qualified, and (3) requested a plausibly reasonable accommodation." *Edmonds-Radford*, 17 F.4th at 992 (citation omitted); *see* 42 U.S.C. § 12101 *et. seq*. If a plaintiff can establish a prima facie failure to accommodate claim, the burden then shifts to the defendant "to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018). Salt Lake City seeks to conclusively rebut Ellis's prima facie case by arguing that she did not provide evidence that she was qualified to perform the essential functions of her job and by showing that she did not request plausibly reasonable accommodations. The City does not attempt to establish an affirmative defense.[4] After examining each party's analysis of the facts, the court finds that Ellis's evidence is sufficient to support her failure to accommodate claim.

### 1.  Plaintiff is Disabled

For the purposes of a claim made under the ADA, the term "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of

---

[4] At the in-person hearing on this motion, Ellis pointed out that the City likely did not argue that granting her accommodations would produce an undue hardship because she was not on the City's payroll when she was negotiating for accommodations. Additionally, Ellis notes that no Captain position was vacant while she was absent from work. This means that the Department did not have to hold off on hiring another candidate while they waited for her return to work. ECF No. 159 at 83 n.134.

such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004) (citing 42 U.S.C. § 12102(2)). Salt Lake City does not dispute that Ellis was disabled per this definition. Indeed, there is a significant amount of evidence, including letters penned by Szykula, Plaintiff's treatment provider, showing the many ways in which Ellis was unable to engage in major life activities. *See, e.g.*, ECF No. 150 at ¶¶ 1, 7, 22.

### 2. Plaintiff was Otherwise Qualified

The ADA prohibits a "covered entity" from "discriminat[ing] against a *qualified individual* on the basis of disability." 42 U.S.C. § 12112(a) (emphasis added). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Aubrey v. Koppes*, 975 F.3d 995, 1056 (10th Cir. 2020) (citing 42 U.S.C. § 12111(8). Plaintiff "bears the burden of showing" she is qualified. *Unrein v. PHC-Fort Morgan, Inc.*, 993 F.3d 873, 877 (10th Cir. 2021). Here, there is a material dispute of fact regarding whether Plaintiff could perform the essential functions of a Station Captain in the Operations Division with accommodations.

In May 2016, the SLCFD offered Plaintiff the choice of taking on a new role as either an Apparatus Captain in the Logistics Division or a Station Captain in the Operations Division after it demoted her from her previous position. Ellis chose to work in Operations. The core function of the Station Captain position is "management of a fire company." ECF No. 151-10. This function requires Station Captains to ensure compliance with department orders, rules, regulations, policies, and procedures; to guarantee that assigned employees, apparatus, equipment, and facilities are maintained to be ready for emergencies; to evaluate emergency situations both in route to and on the scene of incidents; and to establish command over emergency situations. *Id*. To succeed in this role, a Station Captain needs to have "[e]xtensive knowledge of modern principles and tactics used

in fire suppression, rescue and property conservation operations" and the "ability to make decisions under emergency and non-emergency situations." *Id*.

The fact that Department officials offered Ellis the option to serve as a Station Captain is evidence that they believed she was qualified to perform each of the essential functions of the position. But Salt Lake City now argues that it later realized this was not the case. It asserts that during the interactive accommodations process, Ellis admitted that she did not have the experience required for the job because she had not worked in operations for thirteen years, that she did not have the proper training to function in an operations capacity, and that she did not have the necessary physical or mental health for this demanding leadership role. The court is skeptical of each of these arguments.

First, a jury could easily find that Ellis had the experience to successfully work as a Station Captain in the Operations Division. Ellis was employed with the SLCFD for twenty-two years. After starting her career as a firefighter, she served as a Captain in the Department from 2004-2009. While a Captain, she managed the SLCFD Aircraft Rescue Firefighter Training Center and helped teach individuals from around the country how to fight airport fires. She also served as the Salt Lake City International Airport Fire Marshal. In 2009, Ellis was promoted to Battalion Chief. From 2009-2014 she served as the City Fire Marshal and Fire Prevention Bureau Division Chief. In 2014, she was transferred to run Emergency Management, Intelligence, and Logistics for the Department. In sum, Ellis steadily rose through the ranks, including through operations roles, to reach upper management of the Department. The court expects it may be difficult for the City to convince a jury that an individual who managed a training facility for firefighters, led fire operations at a major airport, and ran emergency management for the Department lacked the experience to supervise a single fire station.

Second, a reasonable jury could reject the City's argument that Ellis did not have the proper training to serve as a Station Captain. The City understood that Ellis had not served in operations for quite some time when it decided to reassign her as a Station Captain in May 2016. At this point, her lack of recent training was not an issue. The Department only began to complain that Ellis was untrained once she requested a temporary assignment with the Training Division in March 2017. Additional training is typically considered a reasonable accommodation when an employee is returning from a medical condition, as is the case here. *Wilkerson v. Shinseki*, 606 F.3d 1256, 1265 (10th Cir. 2010). Ellis did not intend for the Department to provide a full course on how to do her job, she simply wished to use training to reduce the risk of mental health issues by slowly easing her way into the Department and to ensure that she remembered how to properly manage fire operations in a low-risk environment.[5] Indeed, the Department should have expected that Ellis might need additional training as a refresher when it offered her the position. This would not have been atypical for a fire department, as Ellis testified that departments around the country often *require* their employees to take refresher courses when they are transferred to new positions. ECF No. 151-9 at 236:21-22. In short, a jury could find that even if she needed some additional training, Ellis was qualified for the job.

Third, a reasonable jury could find that Ellis had the physical capabilities to perform the work of a Station Captain. The City seems to argue that because it had not given Plaintiff a physical evaluation and performance test prior to her return to work, it was impossible to know if she had the strength to lead firefighters into the field. This argument is particularly specious. It was the Department's responsibility to administer the evaluation and test. The court cannot blame Ellis for

---

[5] Defendants characterize Ellis's deposition testimony as requesting "extensive" training beyond what might be normal for a new Station Captain. Yet Ellis actually only believed that "it would be prudent for [her] to have *some refresher* training. . . ." ECF No. 151-9 at 234:7-8.

failing to pass when she never had the opportunity to do so. Additionally, the City produced no evidence that Ellis would have failed any physical exams. While Ellis did state that she did not know whether she would pass either the evaluation or test, the court reads this testimony to reflect Ellis's caution when making guarantees rather than as genuine doubt about her physical health. ECF No. 151-9 at 234:9-236:2 (asked if she could perform required physical tasks, Plaintiff testified, "I had no way of knowing that," but she also explained that she had requested to take the test because it was standard operating procedure).

Fourth, a reasonable jury could find that Ellis's mental health would not have prevented her from successfully serving as a Station Captain so long as the City provided accommodations. The Department first indicated that it would not grant Ellis accommodations two weeks into discussions about her potential return to the office. ECF No. 151-20. It contends that it made this decision in reaction to a letter dated March 8, 2017, in which Szykula provided Green with a summary of Ellis's ongoing mental limitations. ECF No. 151-19. The letter detailed how Ellis had severe limitations related to "manag[ing] multiple priorities," providing "intense customer service," and receiving "multiple stimuli," as well as "moderate limitations" related to "frequent change," "short-term memory," and her "attention span." *Id*. In the letter, Ellis also revealed that her condition "adversely impacted [her] ability to focus, control [her] emotions, stay on task and stay alert," and that she "struggled with attention span issues, decision-making, emotional distress, trust and uncontrollable expression of [her emotions], including spontaneous crying and anger management." *Id*. The City now argues that the information contained in the March 8, 2017 letter was reason enough to deny Plaintiff a chance to work as a Station Captain, even with accommodations. It argues that the Department could not trust her in an emergency management role that required intense focus, leadership, and quick decision-making, especially when Plaintiff

could not even guarantee that she would return to her previous mental health baseline within a reasonable timeframe.

But the City's arguments are based on an incomplete reading of Syzkula's letter. First, the letter clearly states that Ellis's mental health limitations were not necessarily permanent.[6] Indeed, Syzkula maintained that a short period of light duty and training as a soft re-entry into fire operations would have enabled Ellis to treat her mental condition and allowed her to perform the essential functions of her job. While Plaintiff was not fully certain that she would return to her mental health baseline from early in her career,[7] she certainly believed that coming back to the Department would help resolve many of the difficulties she was facing while out of work. As her letter states, "Coming back to work is a big step to restoring myself professionally and personally." ECF No. 151-19 at 5. In sum, it is not beyond dispute that Plaintiff lacked the qualifications to serve as a Station Captain.

### 3. Plaintiff Requested Plausibly Reasonable Accommodations

The Tenth Circuit uses a burden shifting framework to decide whether a requested accommodation is reasonable. *See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267-68 (10th Cir. 2015) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995)). "First, the employee 'need only show that an accommodation seems reasonable on its face, i.e., ordinarily or in the run of cases.'" *Id*. at 1267 (quoting *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)) (further internal quotation marks omitted). "A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue." *Id*. (citing 29

---

[6] Syzkula anticipated that Ellis's "condition [would] improve w/ appropriate accommodations." ECF No. 151-19 at 7.

[7] "Until I have an opportunity to gradually assimilate into my role, it is hard to predict how these conditions will impact my ability to do my job as a station captain." ECF No. 151-19 at 5.

C.F.R. § 1630.2(o)(1)(ii)). "Second, if the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate." *Id*. (quoting *Barnett*, 535 U.S. at 402) (citation, internal quotation marks, and alteration omitted). "Third, if the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Id*. at 1268 (internal quotation marks omitted). Whether a requested accommodation is reasonable is a mixed question of law and fact taking into consideration an employee's disability and employment position. *Osborne*, 798 F.3d at 1267; *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017). Here, the City only contests whether Ellis's request for accommodations was plausible on its face. It does not argue that her request would have been impossible to accommodate.

Ellis claims that the City rejected two plausibly reasonable accommodations: (1) medical leave for her condition until the CSC appeal was resolved, and (2) the opportunity to receive some form of training from the Department on a temporary part-time schedule of five-hours a day, four-days a week. ECF No. 159 at 84. The court agrees with Ellis that her requests for these accommodations were plausibly reasonable.

First, a jury could find that Ellis's request for medical leave until the CSC appeal was resolved was plausibly reasonable. "It is well-settled that a request for leave may lead to a reasonable accommodation–such a request may allow an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions (i.e., attend work) in the future." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds*, *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). The City attempts to distinguish Ellis's request for leave from a typical leave request by arguing that she never identified

the exact duration of her absence. In the Tenth Circuit, "a request for indefinite leave cannot constitute 'reasonable' accommodation [because] such a leave request does not allow the employee to perform the essential functions of the job in the *near future*." *Cisneros*, 226 F.3d at 1129. The City asserts that Plaintiff requested indefinite leave when she informed them that "no one—not even her—could have predicted the duration of [her] leave because there is no 'mental health crystal ball.'" ECF No. 150 at 42.

But the City's argument is off the mark because the Tenth Circuit has refused to take a "strict view" when it comes to determining whether a plaintiff has asked for indefinite leave. *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 676 (10th Cir. 2021). Instead, it has clarified that courts in the Circuit "do not construe the duration requirement [] narrowly, and certainly would not do so in chronic impairment cases." *Id.* Though Ellis did not name a precise day when she would return from leave, she still provided the SLCFD with "an expected duration of [her] impairment" by stating that she would return when "the Civil Service [Commission] appeal is resolved."[8] *Id.*; ECF No. 151-8. Ultimately, Ellis provided a general timeframe for her return in the near future. This is enough to overcome *Cisneros's* rule against indefinite leave.[9]

---

[8] Plaintiff's justification for choosing this date is reasonable. Returning to work when her ongoing employment dispute was pending would have been "stressful" and could have exacerbated her condition. ECF No. 151-8.

[9] The City also attacks Ellis's claim that she requested leave as a reasonable accommodation with two technical arguments. First, it contends that Ellis has not exhausted her administrative remedies by filing a charge of discrimination containing facts related to this discrete instance of alleged discrimination. *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183, 1186 (10th Cir. 2007). Specifically, Defendants maintain that Ellis did not detail the City's failure to grant additional leave in an EEOC charge. The court disagrees that Ellis did not exhaust her remedies. "[E]ven if a charge fails to contain the specified information, it may still be sufficient, provided it is 'a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" *Id.* at 1184 (citing 29 C.F.R. § 1601.12(b)). Ellis's Charge of Discrimination met this bar when it explained how Szykula advised her that she was not fully ready to return to work, but still felt that Ellis had no choice but to return and ask for accommodations. ECF No. 41-3. The

Second, a jury could find that Ellis's request for training with a fire academy on a temporary part-time schedule of five-hours a day, four-days a week was a plausible reasonable accommodation. The City argues that the Station Captain position required Ellis, at minimum, to lead a crew on a 48/96 schedule. Because Plaintiff wished to only work for five hours at a time and attend trainings when she should be with her crew, it maintains that both requests were impermissible "reprieve[s] from [an] essential function." *Robert v. Bd. of Cty. Comm'rs of Brown Cty., Kans.*, 691 F.3d 1211, 1217-18 (10th Cir. 2012). According to the City, these reprieves, akin to requests for indefinite leave, were "not reasonable as a matter of law." *Herrmann*, 21 F.4th at 676.

The court disagrees. A jury could easily find that Plaintiff's requests for slow integration back into the Department were not at all similar to requests for indefinite leave. Indeed, Ellis's treatment provider offered a speedy timeline to transition Plaintiff away from training and part-time hours:

> Ms. Ellis' condition is not permanent and I have confidence that she will be able to return to full duty with time. As previously stated, my recommendation is that Ms. Ellis initially return to a non-emergency operations division, such as the training unit, and that she work 4 days per week, 5 hours per day. I would be willing to reevaluate Ms. Ellis after *two weeks* of working. At that time, if she and I agree that a move to the emergency environment is reasonable, *we can proceed with the prescribed observation period in operations*.

---

court finds that this statement "generally" complains that the City rejected Plaintiff's plausibly reasonable request for additional leave.

Second, the City argues that Ellis's request for additional leave via an email to Lieb on February 17, 2017 was not an ADA accommodations request because it "gave no indication she sought an accommodation for her disability or to permit her to perform the essential functions of her job." ECF No. 175 at 62; ECF No. 151-8. But a reasonable jury could find that the Department could reasonably have concluded that Ellis was asking for ADA accommodations in this email because it was on notice of her mental health struggles and she clearly stated that she wished to take leave to avoid "stressful conditions" at work that would have triggered her anxiety. ECF No. 151-8.

ECF No. 151-19. And Ellis agreed that she was likely to return to an emergency setting after a brief two-week trial period. As she explained in an email on March 13, 2017, "I think the initial duration [of two weeks] was one of my healthcare provider's primary concerns," but if that initial period goes well "[m]y clinician has made it clear that I can come back to work." ECF No. 151-11. Even ignoring Plaintiff's statement that she was aiming for a two-week return, on March 16, Ellis told Green that, at maximum, she would only need four to six weeks to return to work in a full capacity. ECF No. 151-23. This timeframe for a full return is by no means, "indefinite leave." As previously explained, courts in this Circuit do not grant summary judgment just because a plaintiff cannot provide an *exact date* on which she will return to work. *Herrmann*, 21 F.4th at 676. Employers must provide *some* flexibility. *Id*.

The City also argues that neither Ellis's request to enter the Training Division, nor Green's alternative proposal to shadow a Station Captain, were plausibly reasonable accommodations because they would not help Ellis overcome her disability. The court disagrees. The City seems to assume that the only purpose of additional training was to teach Ellis how to be a Station Captain. Insofar as this is the case, the City may have a point that this accommodation was unrelated to ameliorating the effects Ellis's disability. But, from the start, Ellis was clear that one of the primary purposes of a training assignment would be to "facilitate [her] reentry into operations" by "address[ing her] current anxieties about returning to work." ECF No. 151-11. She wanted "gradual re-introduction in a safe (both physically and emotionally,) environment." ECF No. 151-19 at 5. A reasonable jury could find that a slow transition back to work in a training environment was a targeted accommodation that would have allowed Ellis to gain confidence, move past her condition, and again begin working at a high level.

26

### B. DISABILITY DISCRIMINATION AND RETALIATION

Ellis also claims that the City violated the ADA by terminating her employment because of her disability and in retaliation for her accommodation requests. Discrimination and retaliation claims brought under the ADA are analyzed using the *McDonnell Douglas* burden-shifting framework when plaintiffs cannot introduce direct evidence of a defendant's intent, as is the case here. 411 U.S. 792 (1973); *see Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016); *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1109 (10th Cir. 1999). Under this framework, a plaintiff must first establish a prima facie case of discrimination or retaliation. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). The plaintiff's burden in proving a prima facie case of discrimination or retaliation is not an onerous one. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). Next, "the employer has the burden of showing it had a legitimate, nondiscriminatory reason for [its] adverse action [against the plaintiff]. If the employer can do so, the burden shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012) (citation and internal quotation marks omitted).

#### 1. Prima Facie Cases

##### a. Retaliation

To establish a prima facie case of retaliation under the ADA, Ellis must demonstrate (1) that she engaged in a protected activity, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011). Ellis can establish all three elements of a prima facie case of retaliation.

First, Ellis engaged in protected activity under the ADA. Good faith requests for accommodations are undoubtedly protected activity. *Jones*, 502 F.3d at 1194. Second, the City's

decision to terminate Ellis was clearly an adverse employment action. *See, e.g.*, *Tapia v. City of Albuquerque*, 170 F. App'x. 529, 533 (10th Cir. 2006).

Third, Ellis presents sufficient evidence to show that there was a causal connection between her protected activity and the City's adverse employment action. A causal connection is established when a plaintiff provides evidence of circumstances that justify an inference of retaliatory motive, "such as protected conduct closely followed by adverse action." *Garrett v. Hewlett Packard*, 305 F.3d 1210, 1221 (10th Cir. 2002) "[A]n ADA retaliation plaintiff may rely solely on temporal proximity to show causation during the prima facie stage of the *McDonnell Douglas* framework." *Foster*, 830 F.3d at 1191. Here there is a sufficiently close temporal proximity between Ellis's requests for accommodations and the SLCFD's decision to terminate her employment. In the Tenth Circuit, a one-and-a-half-month gap between protected activity and adverse action may, by itself, establish causation. *Id.*; *see also Argo v. Blue Cross & Blue Shield*, Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (holding that six weeks gives rise to a rebuttable inference of a causal connection). Plaintiff requested an accommodation via an email to Green on February 22, 2017. ECF No. 151-14. She was terminated less than a month later, on March 17, 2017. ECF No. 151-25. In short, Plaintiff fulfills each of the elements required to establish a prima facie case of retaliation.[10]

*b. Discrimination*

To establish a prima facie case of disability discrimination under the ADA, Ellis must show she "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable

---

[10] Although the parties do not brief this issue, the court notes that, based upon the current evidence before it, Plaintiff likely will fail to establish causation as it pertains to her claim that the City retaliated against her by interfering with her long-term disability benefits. ECF No. 54 at 63. These benefits were cut off on October 25, 2017—many months after the discussions pertaining to her accommodations concluded in March 2017. ECF No. 151-26.

accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability." *EEOC v. C.R. Eng.*, 644 F.3d at 1037-38.

First, as previously established, Ellis had a disability as defined by the ADA. Second, as previously established, Ellis was otherwise qualified for her position because she could "perform the essential functions of [her] employment position" and maintained "the requisite skill, experience, education and other job-related requirements of [her] employment position." *Aubrey* 975 F.3d at 1006; *Tate*, 268 F.3d at 993.

Third, the circumstances surrounding Ellis's termination "give rise to an inference that the [action] was based on [her] disability." *Smothers*, 740 F.3d at 544. To satisfy the third element of a prima facie case of discrimination, courts "require[] the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision." *Lincoln*, 900 F.3d at 1193 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (emphasis in original)). There are several ways a plaintiff can present affirmative evidence that her disability was a determining factor in a termination decision. Courts infer a discriminatory motive when an employee is terminated with suspicious timing, when similarly situated employees are treated differently, and when decisionmakers make suspicious comments. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). Additionally, an employee can show discriminatory intent by offering evidence that her employer's proffered reason for termination was pretextual. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). "In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law.'" *Chambers v. TRM Copy*

*Centers Corp.*, 43 F.3d 29, 37 (10th Cir. 1994) (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir. 1989).

There is sufficient evidence to create a genuine dispute of material fact over the third element of Plaintiff's prima facie claim. Specifically, Ellis offers enough evidence for a jury to find that the City's stated reason for termination, that she was "unavailable" to work, was pretextual. First, on March 6, 2017, less than two weeks before the Department terminated Ellis, Green offered Plaintiff the opportunity to return to work by temporarily shadowing Station Captains in the Operations Division. ECF No. 151-18. While this proposed accommodation was not Ellis's first choice, she expressed openness to the idea. Indeed, she stated that she hoped "we can agree on this model and move forward as soon as possible," with the caveat that she needed to "revisit this option with my clinician if we can agree on the duration for the first two weeks." ECF No. 151-22. Green responded to Ellis's proposal on March 15, 2017, with the assertion that "you are presently unable to return to a position in Operations (even as an observer)." *Id*. She based this finding on Ellis's treatment provider's statements that she was still experiencing severe mental health limitations. But Szykula also stated that Plaintiff was improving, that returning to work would aid her in this improvement, and that she was competent to return to her role as a Station Captain. ECF No. 151-19. A jury could find that Green's decision to ignore the treatment provider's belief that Plaintiff could return to work in order to justify her abrupt withdrawal of a clearly reasonable accommodation was evidence that her reason for terminating Ellis was pretextual. Indeed, a jury could easily find that Green did not appear to be acting in good faith throughout the interactive process.

While the City might argue that the evidence cited above is not sufficient to show pretext, the court's skepticism of the Department's decision to terminate Ellis is heightened by the findings

of the Civil Service Commission regarding Plaintiff's 2016 demotion.[11] The CSC expressly determined that at least one member of the Department "was looking for reasons to discipline Ellis" and conjuring pretextual reasons for the Department's employment actions. ECF No. 160-1 at 25, 49. This allegation provides a significant reason to believe that the Department's decision to terminate Ellis was pretextual. If the Department pretextually punished Ellis in the past by demoting her, a jury could find that it is not entitled to the benefit of the doubt regarding its subsequent decisions.

### 2. Defendant's Stated Reason for its Decision was Pretextual

The City provides Ellis's unavailability to work as its stated legitimate reason for her termination. Courts routinely find that unavailability is a legitimate, non-discriminatory and non-retaliatory reason for separation. *See, e.g.*, *Anderson v. Zions Bancorporation Nat'l Ass'n*, No. 2:19-cv-00771, 2022 WL 596880, at *6 (D. Utah Feb. 28, 2022) (holding that an employer had a legitimate, non-discriminatory basis for termination where an employee "failed to return to work after his leave expired, and no reasonable accommodation was available"). But, as previously noted, Ellis has "come forward with evidence that the [City] didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). Thus, a jury could find that the City's reason for termination was pretextual. In sum, Ellis has established that she has viable discrimination and retaliation claims under the ADA. As a result, all three of her ADA claims may proceed to trial.

---

[11] The City argues that the CSC decision is not admissible and that, even if it is admissible, it is not entitled to preclusive effect. For reasons discussed in Section III.B of this decision, the CSC decision is admissible. Whether the decision constitutes a basis for collateral estoppel has no bearing on this motion.

### III.     SEX DISCRIMINATION AND RETALIATION CLAIMS

Ellis claims that Defendants violated Title VII and § 1983 by discriminating against her because of her gender.[12] Specifically, she alleges at least five instances of sex discrimination by Defendants: (1) the SLCFD's refusal to promote her to Administrative Chief in September 2014, (2) the City's refusal to promote her to Fire Chief in April 2015, (3) the SLCFD's failure to promote her to Operations Assistant Chief in January 2016, (4) the SLCFD's decision to demote her from Battalion Chief to Captain in May 2016, and (5) the SLCFD's interference with her long-term disability benefits in October 2017.[13] She also claims that Defendants violated Title VII by retaliating against her for engaging in protected activities. Specifically, Ellis argues that she was (1) given a written warning in February 2014 for opposing Dale's discrimination against a co-worker in January 2014, (2) disciplined in May 2015 for filing an EEOC charge in April 2015, (3) demoted in May 2016 for meeting with Mayor Jackie Biskupski in March 2016, (4) terminated in March 2017 for filing the First Amended Complaint in this lawsuit in January 2017, and (5) prevented from accessing her long-term disability insurance in October 2017 for winning her CSC appeal in May 2017.

When a plaintiff lacks direct evidence of discrimination or retaliation, she must prove her case "circumstantially using the three-step *McDonnell-Douglas* framework." *Guy v. McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021). To start, the plaintiff must provide sufficient evidence to support a viable prima facie claim. To establish a prima facie claim

---

[12] Specifically, she alleges that Salt Lake City violated Title VII and § 1983, and that the Individual Defendants violated § 1983.

[13] In her Third Amended Complaint, Ellis also alleges that Defendants discriminated against her by failing to promote her to the unfilled Deputy Chief position in April 2015. This was Dale's position prior to his promotion to Chief of the Department. ECF No. 54 at 38, 51. Because Ellis does not attempt to explain why this failure to promote was discriminatory, the court cannot find that this allegation supports a prima facie case of discrimination.

of sex discrimination, she must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). For purposes of this analysis, it is undisputed that Ellis was a member of a protected class because she claims she was discriminated against because of her gender. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989). To establish a prima facie claim of retaliation, the plaintiff "must present evidence of three things—that [s]he engaged in protected activity, that [s]he suffered an adverse employment action, and that a close causal link exists between the two." *Barrett v. Salt Lake Cty.*, 754 F.3d 864, 866-67 (10th Cir. 2014). After a plaintiff establishes that there is sufficient evidence to support her prima facie claims, the burden shifts to her employer "to articulate some legitimate, nondiscriminatory reason for its decision." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer satisfies this burden, "the ball returns to the plaintiff who must show the employer's stated reasons are pretextual." *Barrett*, 754 F.3d at 867. To decide whether Plaintiff can proceed to trial, the court first examines each of Ellis's discrimination and retaliation prima facie cases alongside Defendants' stated legitimate reasons for their decisions. The court then analyzes Plaintiff's argument that Defendants' stated reasons are pretextual.

### A. PLAINTIFF'S PRIMA FACIE CASES AND DEFENDANTS' REASON FOR ADVERSE ACTION

### 1. Written Warning in February 2014

#### a. *Retaliation*

Plaintiff claims that she was issued a written warning in retaliation for her objection to Dale's characterization of Sarah Behrens as "a real bitch" in a meeting on January 10, 2014. First, Ellis maintains that during this meeting, she took a protected action by "indicat[ing] [her]

disagreement and objection" to Dale's "inappropriate characterization of [Behrens]."[14] ECF No. 151-55. "[V]oicing informal complaints to superiors" qualifies as protected activity. *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008).

Second, Dale's written warning, issued to Ellis on February 6, 2014, qualifies as an adverse employment action. In the Tenth Circuit, adverse employment actions are those that a "reasonable employee" would find materially adverse. *See Bekkem v. Wilki*e, 915 F.3d 1258, 1267 (10th Cir. 2019). A materially adverse action is one "which might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Generally, written warnings are considered to qualify as an adverse employment action when they "produce an injury rising to a level of seriousness" *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (holding that a warning "need not affect the terms and conditions of employment" for it to constitute an adverse action). Here, Plaintiff reasonably argues that Defendants gave her a written warning in order to create a paper trail for her firing. As the warning itself stated, if Ellis's improvement was not "immediate and sustained," "further disciplinary action will be necessary." ECF No. 151-36. The creation of grounds for termination could well dissuade a reasonable worker from reporting discrimination to a superior. Thus, a reasonable jury could find that this written warning qualifies as an adverse employment action.

Third, when analyzing a prima facie case of retaliation in the Tenth Circuit, courts generally find that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

---

[14] For reasons discussed below, the court is not convinced that Plaintiff's use of the word "bitch" when opposing Dale's comment means that she did not push back.

Here, the gap between Ellis's objection and the written warning was less than a month. Thus, Ellis can establish all three elements of a prima facie case of retaliation.

### b. *Legitimate Reason for Adverse Action*

Defendants argue that they issued the written warning because of Plaintiff's poor job performance. The court accepts this as a legitimate non-retaliatory reason for Defendants' adverse employment action.

### 2. **Failure to Promote to Assistant Chief in September 2014**

### a. *Discrimination*

Ellis argues that the Department failed to promote her to Assistant Chief because of her gender in September 2014. Defendants do not dispute that their failure to promote Ellis was an adverse employment action and that she was qualified for the position. There is, however, a dispute over whether their failure to promote Ellis "occurred under circumstances giving rise to an inference of discrimination." *Guy*, 2021 WL 3854764 at *2. A plaintiff may establish an inference of discrimination through (1) "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," (2) "preferential treatment given to employees outside the protected class," (3) "a pattern of recommending the plaintiff for position[s] for which she is not qualified [or over-qualified]," and (4) "a failure to surface plaintiff's name for positions for which she is well-qualified." *Plotke*, 405 F.3d at 1101.

Here, Ellis contends that the decisionmakers responsible for the decision not to promote her, Cook, Lieb, and Dale, justified their decision to promote McMicken using discriminatory language. Specifically, Lieb told Plaintiff that during her interview she had not demonstrated humility" and had not "acknowledge[d] h[er] weaknesses." ECF No. 151-9 at 91:6-92:8. A jury could find that telling Ellis that she was not humble enough for the job is a quintessentially sexist statement. Ellis was a high-ranking officer seeking promotion in a paramilitary emergency services

department. In such settings, it is often expected that men will be assertive and aggressive. Plaintiff may have been criticized because she did not meet the Department's contrary expectations for women. Additionally, Dale's frequent use of the word "bitch" to describe female employees is an indication that one of the main decisionmakers in the hiring process harbored animus towards women. ECF No. 151-9 at 91:6-92:8. Moreover, the fact that there was no formal hiring process for the position suggests that the job was filled using an "old boys" hiring network. Ultimately, the court finds that Ellis has provided enough evidence to establish a prima facie case of discrimination related to her lack of promotion to Assistant Chief.

### b. *Legitimate Reason for Adverse Action*

Defendants contend that they did not promote Plaintiff because of her poor job performance. Specifically, they state that they had concerns about Ellis's ability to work alongside others on the Department's leadership team, especially Lieb and Dale. The court accepts this as a legitimate non-discriminatory reason for Defendants' adverse employment action.

### 3. **Failure to Promote to Fire Chief in April-May 2015**

### a. *Discrimination*

Ellis argues that the City failed to hire her as Fire Chief in 2015 because of her gender. As an initial matter, the City argues that Ellis may not advance this claim because she did not exhaust her administrative remedies. Specifically, it contends that Plaintiff did not identify this discrete act in her EEOC Charge, preventing her from bring a claim regarding the Fire Chief incident. *See Alabi v. Vilsack*, 860 Fed. App'x. 576, 581 (10th Cir. 2021) (requiring plaintiff "to exhaust each discrete act underlying his claims") (citing *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003)). "A plaintiff's claim in court 'is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.'" *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (quoting

*MacKenzie v. City and Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005), *abrogated on other grounds*, *Lincoln*, 900 F.3d 1166). Here, Ellis included facts in her May 5, 2015 EEOC Charge that could have led to an investigation of the Fire Chief hiring process. Specifically, she alleged that "Ms. Ellis is and has always been a strong candidate for the Fire Chief position based on her training and experience." ECF No. 43-2. She also noted that "[i]t does not appear that there was any public process or that any [] candidates [other than Dale] were considered," for the position. *Id*. While these statements referencing the Fire Chief incident do not flesh out a full claim against the City, they are sufficient to find that Ellis exhausted her administrative remedies.

The City's second argument against Plaintiff's prima facie case is likewise unpersuasive. The City does not dispute that an employer's failure to promote is an adverse employment action and that Plaintiff was qualified for the Fire Chief position. Ellis, therefore, easily satisfies the first three elements of a prima facie claim. But the City contends that Ellis cannot show that she was discriminated against because she did not apply for the position until after a new Chief had already been selected. Ellis does not claim that she formally applied for the position prior to Dale's promotion, but counters that a plaintiff need not formally apply for a position in order to establish a prima facie case of discrimination. *See Bennett v. Quark, Inc.*, 258 F.3d 1220, 1228 (10th Cir. 2001) ("the law does not require that a plaintiff formally apply for the job in question"), *overruled in part on other grounds*, *Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003). Still, to establish a prima facie case of discrimination, a plaintiff must show that her employer was "on specific notice that the plaintiff seeks employment or, where informal hiring procedures are used, that the plaintiff be in the group of people who might reasonably be interested in the particular job." *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1251-52 (10th Cir. 1992). Here, Ellis claims there was no formal hiring process and that she was in the group of people who might

reasonably be interested in the job. ECF No. 151-35 at 16:16-22. The record supports both claims. Indeed, the City has admitted that it suspected Ellis would be interested in the job because it considered her for the position in the first stages of the selection process. ECF No. 151-35 at 11:14-13:18.

To supply affirmative evidence that she was discriminated against, as the fourth prong of a prima facie discrimination case requires, Plaintiff contends that the fact there was no formal hiring process is indicia of discrimination. The court is disinclined to find that this is enough for a showing of discrimination even though only *de minimis* evidence is required to establish a prima facie claim. *Plotke*, 405 F.3d at 1102. While the lack of a formal hiring process may be evidence that an "old boys club" existed in city hiring, it is not sufficient on its own to show that such a *gender-based* discriminatory hiring network existed. Indeed, Plaintiff cites no case law showing that a court has ever found a prima facie case of discrimination simply because of the lack of a formal hiring process. Therefore, Ellis fails to establish that her lack of promotion to Fire Chief was an act of discrimination.

### 4. Discipline in April 2015

*a. Retaliation*

Ellis claims that in April 2015, McMicken sent her a pre-determination letter in retaliation for a letter she sent to the EEOC dated March 16, 2015, in which she amended her Charge of Discrimination to include McMicken. The Defendants agree that McMicken's pre-determination letter was an adverse employment action and that amending an EEOC Charge is a protected activity; however, Defendants deny that Ellis actually sent an EEOC amendment in March 2015. *See McGarry v. Bd. of Cty. Comm'rs of Cty. of Pitkin*, 175 F.3d 1193, 1201 (10th Cir. 1999) (holding that submitting an EEOC claim is protected activity). The court is perplexed by this argument. Ellis clearly sent a letter detailing her claims against McMicken on March 16, 2015.

ECF No. 43-1. In this letter, Ellis stated that McMicken had denied her professional growth and networking opportunities, unjustifiably scrutinized her work, and made defamatory statements regarding her work.[15] *Id*. She also offered factual support for these assertions. Because the gap between Plaintiff's protected activity and the adverse employment action in question is roughly one month, Ellis satisfies the causation requirement and establishes a prima facie case of retaliation. *See Anderson*, 181 F.3d at 1179.

### b. *Legitimate Reason for Adverse Action*

Defendants argue that McMicken disciplined Plaintiff because of her poor job performance. Specifically, they contend that Ellis was not engaged in her new role as Division Chief of Logistics, that she was rude in meetings, and that she routinely bypassed the chain of command. The court accepts this as a legitimate non-retaliatory reason for Defendants' adverse employment action.

### 5. **Failure to Promote to Operations Assistant Chief in January 2016**

### a. *Discrimination*

Ellis argues that Defendants failed to promote her to Operations Assistant Chief because of her gender in January 2016. It is undisputed that an employer's failure to promote is an adverse employment action and that Plaintiff was qualified to take on the role of Operations Assistant Chief. Ellis argues that Defendants' decision not to promote her exhibited signs of discrimination because the three individuals responsible for the decision, McMicken, Lieb, and Dale, all "had

---

[15] Defendants suggest that "there is no evidence that McMicken was . . . aware of the Plaintiff's November 2014 EEO [sic] claim when he issued the April 27, 2015, pre-determination notice." ECF No. 150 at 64. While there may not be evidence that he knew of the complaints against him, because of the timeline of events and nature of McMicken's actions throughout the case, a jury could reasonably infer that McMicken was aware of the EEOC charges against both him and the Department.

extensive histories of actions and remarks 'that could be viewed as reflecting a discriminatory animus.'" ECF No. 159 at 70 (quoting *Plotke*, 405 F.3d at 1101). This included Lieb's potentially gendered statement that Ellis had not sufficiently "demonstrated humility" and Dale's frequent use of the word "bitch" to describe female employees. ECF No. 151-9 at 91:6-92:8. This alone is enough to establish a prima facie case of discrimination.

### b. *Legitimate Reason for Adverse Action*

Defendants argue that they did not promote Ellis because she was less qualified than Clair Baldwin, the individual who was hired to fill the position. The court accepts this as a legitimate non-discriminatory reason for the Defendants' adverse employment action.

### 6. **Demotion in May 2016**

### a. *Discrimination*

Ellis argues that she was demoted from Battalion Chief to Captain because of her gender in May 2016. A demotion is a core type of adverse employment action. *See, e.g., Baca v. Sklar*, 389 F.3d 1210, 1217 n.2 (10th Cir. 2005). And Defendants do not contest that Plaintiff was qualified for her position. Indeed, Defendants only contend that Ellis cannot offer evidence that she was treated worse because she is a woman. Specifically, they note that there is no evidence to suggest that McMicken, the man who made the decision to demote Ellis, harbored animus towards women.

Setting aside the issue of whether McMicken exhibited signs of animus, Ellis easily establishes a prima facie case of discrimination because deposition testimony indicates that it was actually Dale who made the final demotion decision. ECF No. 151-2 at 24:20-25. According to four separate witnesses, Dale regularly used sexist language to refer to female employees. These remarks easily constitute "remarks made by decisionmakers that could be viewed as reflecting a

discriminatory animus." *Plotke*, 405 F.3d at 1101. Thus, Ellis can establish that her demotion supports a prima facie case of discrimination.

   *b. Retaliation*

   Ellis also claims that she was demoted in retaliation for meeting with Mayor Jackie Biskupski to discuss the SLCFD's hostile work environment. Ellis's meeting with Biskupski on March 30, 2016 qualifies as protected activity because Ellis used it to report discrimination to a superior. ECF No. 151-9 at 254:6-256:6; *Fye*, 516 F.3d at 1228. The Department allegedly responded by demoting Plaintiff to Captain on May 3, 2016. ECF No. 151-9 at 231:4-7. Once again, demotion is an adverse employment action. *See, e.g., Baca*, 389 F.3d at 1217 n.2. The gap between Ellis's protected activity and her demotion was roughly a month. This time difference is short enough to establish causation and, thus, a prima facie case of retaliation. *See Anderson*, 181 F.3d at 1179.

   *c. Legitimate Reason for Adverse Action*

   Defendants argue that they demoted Plaintiff due to her poor job performance. Specifically, they contend that Plaintiff did not improve her behavior at work after receiving the written warning in 2014 and a suspension in 2015. The court accepts this as a legitimate non-retaliatory and non-discriminatory reason for the Defendants' adverse employment action.

   **7. Termination in March 2017**

   *a. Retaliation*

   Ellis seeks to establish that Defendants retaliated against her by terminating her employment on March 17, 2017, just one week after accepting service of her First Amended Complaint in this suit. ECF No. 151-25; ECF No. 2-4. First, the filing of a lawsuit is certainly protected activity under Title VII. *Fye*, 516 F.3d at 1228. Second, termination is a quintessential adverse employment action. Third, there was less than a month between the service of the First

Amended Complaint and Ellis's termination, meaning that Plaintiff can establish causation. But there is a wrinkle to the timing issue. The court must decide whether the clock begins running for causation purposes when Plaintiff filed her First Amended Complaint, which actually occurred in January, or when Defendants acknowledged that they received the complaint on March 10, 2017. In the Tenth Circuit, knowledge of a protected activity is necessary to prove retaliation. *See United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 766 (10th Cir. 2019) ("To adequately plead a retaliation claim, a plaintiff must aver that the defendant was on notice of her protected activity."). This means that the logical date upon which to begin the causation clock is when the Defendants learned of the First Amended Complaint. At trial, Defendants may be able to offer evidence that they knew of the First Amended Complaint in January, but absent the production of that evidence now, the court finds that Plaintiff has established this prima facie case of retaliation.

### b. *Legitimate Reason for Adverse Action*

Defendants argue that they legitimately terminated Plaintiff because she refused to work (as detailed in Section II of this decision). The court accepts this as a legitimate non-retaliatory reason for Defendants' adverse employment action.

### 8. **Interfering with Long-Term Disability Benefits in October 2017**

### a. *Discrimination*

Ellis contends that, in October 2017, Defendants discriminated against her by interfering with her ability to access long-term disability benefits under a disability insurance policy she held with Aetna. This claim is entirely based on a phone conversation with an Aetna representative who asked whether there was "any chance you are in a lawsuit with Salt Lake City?" When Ellis confirmed that she was, the official replied, "Oh, that explains a lot." But this evidence is insufficient to establish a prima facie case of discrimination. It is mere conjecture to assert that

Aetna knew about the lawsuit due to the fact that the City had contacted the company to pressure it into denying Plaintiff's claim.

### b. Retaliation

Finally, Ellis claims that Defendants interfered with her ability to access long-term disability benefits in retaliation for her May 2017 victory in the CSC appeal. But Plaintiff does not provide sufficient evidence to support this prima facie case of retaliation because the temporal proximity between the CSC decision in May 2017 and the termination of her long-term disability benefits in October 2017 is too distant to establish causation. *See Anderson*, 181 F.3d at 1179.[16]

In summary, while Ellis has not established a prima facie case on all her claims, she has provided sufficient evidence to advance several retaliation and discrimination claims. Defendants respond by offering legitimate non-retaliatory and non-discriminatory reasons for the Department's adverse employment action in each case. Thus, the court now turns to the issue of pretext to determine whether Plaintiff's claims may proceed to trial.

### B. PRETEXT

If a defendant-employer articulates a legitimate reason for its adverse employment action, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason for termination was a pretext for discrimination or retaliation. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). "A showing of pretext does not require a plaintiff to offer any direct evidence of actual discrimination . . . . An employee may show pretext based on weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's claimed

---

[16] If Ellis can establish the prima facie claims related to her long-term benefits at a future point, the court will then review Defendants' arguments regarding the Utah Governmental Immunity Act (Utah Code § 63G-7-201(4)(b)), damages, and the admissibility of the statement from the Aetna official.

legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief. Demonstrating pretext enables a plaintiff to survive summary judgment." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007). The most direct way to show pretext is "with evidence that the defendant's stated reason for the adverse employment action was false." *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1223 (10th Cir. 2000).

Here, the CSC decision is powerful evidence that the legitimate, nondiscriminatory reasons proffered by the Defendants were pretextual. Defendants' stated reasons for termination almost all boil down to the Department's contention that Plaintiff's performance was seriously lacking. But this is belied by the CSC decision, which stated that "allegations of Ellis' lack of performance are not supported by substantial evidence," that McMicken was "attempting to build a case to discipline Ellis, instead of trying to coach and counsel a dedicated employee on how she can improve her performance," and that "the reasons cited by the City for demoting the Plaintiff were 'trivial in nature.'" ECF No. 160-1. A reasonable jury could easily infer from the CSC decision that Defendants' stated reasons for their failure-to-promote and demotion of Ellis are implausible, incoherent, and contradicted by the evidence even if the CSC's decision does not directly address all of the reasons that Defendants supply for their actions. If the CSC decided that Defendants were looking for a trivial reason to fire Plaintiff, a jury could plausibly reach the same conclusion.[17]

---

[17] Ellis seeks to use the CSC decision to preclude Defendants from re-litigating its decision to demote her in May 2016. The court need not decide now whether collateral estoppel applies in this instance. It notes, however, that the Supreme Court has held that "a federal district court in a proceeding under 42 U.S.C. § 1983 must give a state agency's fact-finding the same preclusive effect to which it would be entitled in the state's court if the state agency: (1) was acting in a judicial capacity; (2) resolved disputed issues of fact properly before it; and (3) the parties had an adequate opportunity to litigate the issues in dispute." *Atiya v. Salt Lake Cty.*, 988 F.2d 1013, 1019 (10th Cir. 1993) (citing *University of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)). Applying this standard, the Tenth Circuit has specifically determined that the decision of a properly functioning CSC in Utah can provide a basis for collateral estoppel. *Atiya*, 988 F.2d at 1019. Still, a CSC decision's preclusive effect is not absolute. Under the Supreme Court's ruling in *Elliott*, a "federal

Recognizing that the CSC decision is a significant obstacle to summary judgment in their favor, Defendants argue that the court should ignore it. They contend that the CSC decision is inadmissible under Federal Rules of Evidence 401 (lack of relevance), 602 (lack of personal knowledge), 701 and 702 (purported expert testimony on ultimate issues), and 801 (hearsay). The court is not persuaded. First, the CSC decision is clearly relevant because it includes findings tending to show that Defendants' reasons for taking adverse employment actions against Ellis were pretextual. The bar for admission under Rule 401 is "very low." *United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998)).

Second, Rules 602, 701, and 702 apply only to witness testimony, and thus, are not directly applicable to the written decision of the CSC. Thus, these rules do not affect the admissibility of the CSC decision itself.

Third, Rule 801 does not apply because the CSC decision falls within the public records exception to the rule against hearsay. According to Fed. R. Evid. 803(8), a record or statement of a public office is not excluded as hearsay if it sets out . . . (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation. The Rule also requires that the source of information or investigation does not lack trustworthiness. *Id*. Interpreting Rule 803(8), the Supreme Court has held that "Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo." *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976). Further,

---

court must only give the fact-finding of the CSC such preclusive effect to which it would be entitled in a state court in Utah." *Id*.

"factually based conclusions or opinions are not . . . excluded from the scope of Rule 803(8)(c)."[18] *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 (1988). The Tenth Circuit has extended these rulings to clarify that "in civil actions, agency reports are admissible under Fed. R. Evid. 803(8)(c) if they are prepared pursuant to authority granted to the agency by law and are trustworthy." *Hall v. W. Prod. Co.*, 988 F.2d 1050, 1057-58 (10th Cir. 1993).

Here, reaching its decision the CSC engaged in an extensive investigation via sworn interviews of witnesses, as legally authorized by Utah law. And the court finds that the CSC decision is sufficiently trustworthy to admit as evidence. While Defendants argue that one of the CSC panel members was friends with Ellis, there were still two independent members of the panel who signed onto the unanimous decision. Moreover, any association between Ellis and one of the panel members may go to the weight the jury gives this evidence rather than to its admissibility.

In sum, Ellis establishes prima facie cases of sex discrimination and retaliation under Title VII and § 1983. Because she presents evidence tending to show that Defendants' proffered reasons for taking adverse employment actions against her are pretextual, her claims survive summary judgment.

## IV.    HOSTILE WORK ENVIRONMENT CLAIMS

Ellis claims that Defendants established a hostile work environment in violation of both § 1983 and Title VII.[19] Defendants offer several responses. First, they argue that Plaintiff's claims fail because she cannot carry her burden of showing that their conduct was "severe or pervasive" enough to establish liability. Second, they argue that Plaintiff's § 1983 claims fail because Salt

---

[18] Rule 803(8)(iii) is the updated version of Rule 803(8)(c). The changes to the rule do not impact the court's analysis.

[19] Plaintiff brings her hostile work environment claim under § 1983 against all Defendants and her Title VII claim solely against Salt Lake City.

Lake City is entitled to municipal immunity and the Individual Defendants are entitled to qualified immunity. And third, they argue that Plaintiff's Title VII claim fails because she failed to exhaust her administrative remedies. The court examines each defense in turn.

### A.  SEVERE OR PERVASIVE CONDUCT

To prevail on a hostile work environment claim, a plaintiff must "show that a rational jury could find that [her] workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1171 (10th Cir. 2018). She "must show an environment that was both objectively and subjectively hostile." *Id*. In evaluating the circumstances, courts "consider[ ] such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (citation omitted).

While isolated acts of discriminatory language do not give rise to liability on their own, the court's inquiry still "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). As the Tenth Circuit has helpfully stated, "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3rd Cir. 1990)). Moreover, it is important to note that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is

quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quotation marks omitted).

Here, Ellis presents sufficient evidence to prevail on her hostile work environment claim. First, during a January 10, 2014 meeting,[20] Dale stated that "Sarah can be a real bitch." Plaintiff responded, "But you know what? The bitchier the women, the more I actually like 'em. I mean I love Mary Beth. I really like working with her," in reference to another female City employee.[21] ECF No. 33 at 2:15-24. At this meeting, Dale also allegedly made a comment about throwing tampons at employees who were acting weak. ECF No. 151-9 at 50:5-9.

Second, in February 2014, Dale met with Ellis and HR consultant Jennifer Sykes to discuss Plaintiff's performance issues. At this meeting, Dale attempted to encourage Plaintiff to build relationships with her subordinates by stating the following:

> We talked about relationships. We talked about I want you to get out there in front. Talked about at the grass[root] level, this is what you can do. As a captain, this is what I'm seeing -- boom, boom, boom -- this is how you do it. "God, she can do it. If a girl can do it, I mean --" You know how guys are out there. If we sit up here in the ivory tower and talk above their heads—

ECF No. 34 at 1:11:33-12:14. Regardless of Dale's intent in making this statement, a jury could easily interpret his words to condone the sexist attitudes of Plaintiff's subordinates and to denigrate the ability of women in general. Indeed, Plaintiff states that she felt she was "being

---

[20] While Dale made these comments just outside of the time period strictly allowed by the statutes of limitation for Plaintiff's § 1983 and Title VII claims, the court may consider them using the "continuing violation" doctrine. *Hamer v. City of Trinidad*, 924 F.3d 1093, 1098-99 (10th Cir. 2019).

[21] Defendants seek to offer this evidence as proof that Plaintiff was not subjectively offended by the word "bitch" since she used it during the exchange. But Plaintiff's explanation for why she used the word is compelling. She argues that she was trying to diffuse the situation by reclaiming the word. The court is not blind to the fact that when a woman uses the word "bitch" to compliment a co-worker, it is not the same as when her male colleague uses the same word to denigrate her. Context matters.

belittled and condescended for being a woman" when she heard this comment. ECF No. 151-9 at 64:13-20.

Third, over the course of several years, many individuals heard Dale call Ellis a "bitch." For instance, Everitt claims to have heard Dale refer to Plaintiff as a "bitch" during a conversation that occurred sometime before January 2016. Similarly, on August 3, 2015, Captain Steve Hoffman told Green that Dale had, on multiple occasions, stated that "he did not like [Battalion Chief] Ellis," that he "wrote her up," that he was "finally going to hold her accountable," and that he "really hate[d] that bitch." ECF No. 160-4 at 45:21-46:5. Additionally, on August 31, 2015, Brittany Blair told Green that during a meeting with Dale, Lieb, and McMicken, Dale called Ellis "a bitch." *Id*. at 50:3-13. Finally, on October 20, 2015, Sarah Bohe also told Green that while Dale was describing work projects, he stated, "Oh that fucking bitch is making it so hard," referring to Ellis.[22] *Id*. at 36:6-14.

Fourth, on November 2, 2015, Crystal VanDongen reported to Green that she "had been discriminated against based on [her] gender, been subjected to a hostile work environment and been retaliated against based on [her] affiliation with Battalion Chief Martha Ellis." ECF No. 160-14. She told Green that she heard Dale, Lieb, and other men in the department refer to their female employees as bitches. *Id*. She also claimed that she was being "pushed around and men aren't,"

---

[22] Defendants argue that these complaints are inadmissible hearsay under Fed. R. Evid. 801 because they are unsworn statements offered to prove the truth of the matter asserted. The court disagrees. First, each statement is pulled directly from Green's sworn testimony and Plaintiff can offer it to show, at the very least, that Green was aware of hostile work environment complaints and did nothing in response. Additionally, "evidence need not be submitted in a form that would be admissible at trial" so long as "the content or substance of the evidence" is admissible. *Argo*, 452 F.3d at 1199 (internal quotations marks omitted). Here, Plaintiff could call each of the three individuals who complained to Green to testify about their experiences.

and that she was being "forced into a different position as a means of trying to ultimately hurt [Battalion Chief] Ellis."[23] *Id.*

Fifth, in a letter to Green dated May 23, 2015, Ellis argued that she had been subjected to orders that led her to believe that her supervisors had a lesser opinion of women than men. ECF No. 160-15. Specifically, she alleged that Dale had instructed her to issue written warnings to women in the Department for minor breaches of workplace norms, while she was "constantly being told I couldn't write him [a male subordinate] up and I couldn't move forward" with discipline. ECF No. 151-9 at 63:2-70:19; *see also id.* at 2. In her mind, "guys would keep getting the get-out-of-jail-free cards and, you know, the rules were different for the women." She also noted that a male employee of the Department had not been punished when he emailed only female employees requesting that they bring a salad to an office party. ECF No. 151-9 at 63:2-70:19; *see also* ECF No. 160-14.

Sixth, as previously discussed, Ellis argues that when she met with Cook, Dale, and Lieb following their failure to promote her to Administrative Assistant Chief, Lieb had used sexist language to justify the Department's decision. Specifically, Lieb told her that during her interview she had not "demonstrated humility" and had not "acknowledge[d] h[er] weaknesses." ECF No. 151-9 at 91:6-92:8. A jury could find that telling Ellis to act more humbly is a quintessentially sexist statement.

---

[23] Defendants argue that evidence of VanDongen's claim is not admissible because Ellis may not call VanDongen as a witness at trial to testify about the SLCFD's hostile work environment or discrimination. Defendants contend that Plaintiff never volunteered that VanDongen had such information in her initial disclosures, so she is barred from speaking on the topic. ECF No. 176-5. The court disagrees. Plaintiff stated that VanDongen had information regarding Ellis's "written warning and suspension," as well as her "demotion and/or engagement with work." *Id.* Sharing information about the hostile work environment at the SLCFD is necessary for VanDongen to explain why Ellis was punished by her employer. Thus, VanDongen may testify.

While the acts detailed by Ellis are neither numerous nor individually severe, when considered in the context of Ellis's claims that she was retaliated against, denied promotions, demoted, and eventually terminated for pretextual reasons, they gain enough significance to create hostile work environment liability because they "unreasonably interfere[] with an employee's work performance." *Payan*, 905 F.3d at 1171. Evidence already discussed in the discrimination and retaliation sections of this memorandum decision indicates that the sexist attitudes of Plaintiffs' colleagues were sufficient to have plausibly impacted her ability to perform her work. To cite just one example, the CSC Decision found that Ellis was singled out for punishment by McMicken on a regular basis. "[A]lmost from the outset of the time that Ellis became a Division Chief, [McMicken] was monitoring her in a way that singled her out and indicated he was looking for reasons to discipline her." ECF No. 160-1 at 41. McMicken also demoted Ellis[24] using contrived violations of the City's employment code and hoisted unrealistic expectations on her shoulders in an attempt to hound her out of a job. This evidence is supportive of Ellis's claim that she was forced to accept a position in Operations that she did not want to take because she could not continue working for McMicken. A jury could find that this treatment of Ellis, along with the sexist insults lobbed her way, significantly impeded her ability to work and, thus, constituted a hostile work environment.[25]

---

[24] With Dale's approval.

[25] Defendants also argue that the hostile work environment claims against Lieb and McMicken should be dismissed because "Plaintiff does not allege Lieb or McMicken engaged in any conduct related to a hostile work environment." ECF No. 150 at 41. The court disagrees. Based on the CSC Decision, a jury could find that McMicken constantly harangued Ellis in ways motivated by gender-based animus. He allegedly attempted to control essential parts of her job, tracked her goings in and out of the office, and compared her to a secretary. Plaintiff reasonably argues that he never would have treated a man in such a way.

Similarly, a jury could find that Lieb failed to exercise any control over McMicken and Dale. The evidence indicates that Lieb did nothing while Dale regularly used offensive language in his presence. Ellis also argues that there is evidence indicating that Lieb referred to his female

### B.  § 1983 CLAIMS AGAINST THE CITY – MUNICIPAL IMMUNITY

Defendants also seek summary judgment on Ellis's § 1983 claims by attempting to establish that they are entitled to two forms of immunity. First, Defendants argue that Salt Lake City is immune from suit under the *Monell* municipal immunity doctrine. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). According to *Monell*, for a plaintiff to successfully establish that a municipality is not immune from a § 1983 claim, the plaintiff must (1) identify the "government[] policy or custom"; (2) "that caused the [constitutional] injury"; and (3) "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (internal quotation marks and citations omitted). In simpler words, there are three elements a plaintiff must establish to overcome immunity: "(1) [an] official policy or custom, (2) causation, and (3) state of mind." *Id*. On summary judgment, Ellis meets each of these burdens.

First, Ellis must identify a governmental policy or custom to serve as a basis for her claim. "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is [1] a formally promulgated policy, [2] a well-settled custom or practice, [3] a final decision by a municipal policymaker, or [4] deliberately indifferent training or supervision." *Id*. at 770. When a plaintiff is unable to point to a specific policy that has deprived her of her constitutional rights, the Supreme Court has "recognized that [she] may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the

---

employees as "bitches" and demeaned her using a sexist trope by telling her she was not receiving a promotion due to her lack of humility. Additionally, Ellis maintains the CSC Decision found that Lieb was part of a "triumvirate" that "systematically removed the Plaintiff from executive leadership roles, denied her promotions, and demoted her without just cause." ECF No. 159 at 64. This evidence is sufficient to preclude summary judgment.

force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).

Here, Plaintiff alleges that the City maintained an unofficial custom of permitting a hostile work environment in the SLCFD. This custom was evidenced by "the widespread nature of the conduct directed not only at the Plaintiff, but also at other female employees of the City." ECF No. 87 at 26. Plaintiff was not shy about reporting the Individual Defendants' conduct to the City over and over again. She reported discrimination and hostile comments to the Fire Chief, the Mayor's Chief of Staff, Green, and Sykes. Additionally, Bohe, Hoffman, Blair, and VanDongen all reported misconduct to Green. While it is true that Green investigated these individuals' complaints, she dismissed most of their seemingly corroborated allegations as unsubstantiated and, when she did find malfeasance, hardly recommended any punishment. It was only when audio of Dale using gendered language was leaked to the press that a member of the department faced significant consequences for his actions. Ultimately, there is sufficient evidence for a jury to find that the City maintained a de facto custom of constructively ignoring complaints of a hostile workplace in the SLCFD.

Second, Ellis must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Schneider*, 717 F.3d at 770 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)). "This requirement is satisfied if the plaintiff shows that 'the municipality was the moving force behind the injury alleged.'" *Id*. (quoting *Brown*, 520 U.S. at 404) (further internal quotation marks omitted). Here, the City's alleged maintenance of a hostile work environment is clearly related to the constitutional deprivation Ellis faced when she was subjected to this environment.

Third, Ellis must establish that Salt Lake City had the requisite state of mind when it chose to maintain a hostile work environment. Where a "plaintiff [is] seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights," she "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id*. at 407 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). To establish deliberate indifference, plaintiffs must show that a municipality "ha[d] actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). A plaintiff can establish notice "by proving the existence of a pattern of tortious conduct," or by demonstrating that her case belongs to a "narrow range of circumstances," where deliberate indifference can be found absent a pattern of violations. *Id*. (quoting *Brown*, 520 U.S. at 409). Here, Ellis can show that Salt Lake City was deliberately indifferent because of the sheer number of hostile work environment and discrimination complaints that she and others submitted over the course of several years. A reasonable jury could find that the City knew that an unconstitutional hostile work environment existed in the SLCFD, yet did nothing to resolve the issue. In sum, there is sufficient evidence for Ellis to overcome Salt Lake City's municipal immunity.

## C. § 1983 CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS – QUALIFIED IMMUNITY

Defendants also argue that each of the Individual Defendants are entitled to qualified immunity because "(1) a reasonable jury could [not] find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant[s'] conduct." *Durand v. Shull*, No. 21-1180, 2022 WL 1184041, at *2 (10th Cir. Apr. 21, 2022) (citation omitted). Defendants maintain that Ellis does not meet the first prong of this test because the

Individual Defendants did not commit a constitutional violation. They also contend that she cannot meet the second prong because the Tenth Circuit has not clearly established that the Individual Defendants' alleged conduct is unconstitutional. Neither argument is persuasive.

First, the court has already determined that a reasonable jury could find that members of the SLCFD subjected Ellis to a hostile work environment. Second, the Tenth Circuit has clearly stated that the creation of a hostile work environment is unconstitutional. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted). "The law has been clearly established in this circuit since May of 1989 that sexual harassment under color of state law violates the Equal Protection clause."[26] *Stepp v. Proctor*, 13 F.3d 407, 1993 WL 498172, at *1 (10th Cir. 1993) (citing *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989)). Defendants protest that, though sexual harassment (and, thus, the creation of a hostile work environment) clearly violates the Equal Protection Clause, the Tenth Circuit has not clearly held that the Individual Defendants' particular alleged conduct rose to this level. They argue that "it is insufficient to identify an abstract constitutional right such as a right to be free of sexual harassment," and that a "particularized review of [Defendants'] actions" is needed. *Fye v. Oklahoma Corp. Comm'n*, 175 F. App'x 207, 211 (10th Cir. 2006) (quotation marks omitted).

This court disagrees. The Supreme Court's "case law does not require a case directly on point for a right to be clearly established" so long as "existing precedent [has] placed the statutory

---

[26] Defendants complain that *Stepp* is an unpublished decision so the court cannot consider its holding as evidence of a clearly establish right. 13 F.3d 407. But *Stepp* cites *Starrett v. Wadley*, the case that established sexual harassment as a violation of the Fourteenth Amendment. 876 F.2d at 814. *Starrett* was a published decision. *Id*.

or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). Here, it is beyond debate that repeatedly referring to female employees as "bitches," making sexist insinuations, and berating female employees for failing to meet higher standards than those applied to similarly situated men is unconstitutional.[27] Ultimately, "the legal question of qualified immunity turns upon which version of facts one accepts[. T]he jury not the judge, must decide liability." *Maestas v. Lujan*, 351 F.3d 1001, 1008 (10th Cir. 2003).

## D. EXHAUSTION

Finally, Defendants argue that Ellis failed to properly exhaust her administrative remedies with the EEOC before bringing her hostile work environment claim, as required by Title VII. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 755 (10th Cir. 2000). Specifically, they contend that the court should grant summary judgment because Ellis's Charge of Discrimination contained only conclusory allegations related to her claim of a hostile work environment.

"To exhaust a federal claim, '[an EEOC] charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim[.]'" *Alabi*, 860 F. App'x at 579 (quoting *Jones*, 502 F.3d at 1186). Ellis's initial November 24, 2014 Charge of Discrimination articulated facts supporting her hostile work environment claims. In this Charge, Ellis alleged that "my direct superior, Deputy Chief Dale, made numerous derogatory 'female' remarks, directed at me or at other women in the Department or City." ECF No. 41-1. This type of broad factual allegation is enough to serve as an initial basis for a hostile work environment claim. But even if this was not the case, Ellis's March 16, 2015 letter amending her initial Charge included additional factual details related to her hostile workplace claim. For instance, the letter pointed out specific

---

[27] The Tenth Circuit applied a similar standard in *Fye*, when it held that a reasonable official should have known his actions constituted unconstitutional sexual harassment even without the existence of a case with the exact same fact pattern. 175 F. App'x at 211.

ways in which McMicken had fostered hostility in the office. ECF No. 43-1. And on July 8, 2016, Ellis sent another letter to the EEOC again amending her Charge. This communication detailed how Dale had referred to the Plaintiff as a "bitch" and a "fucking bitch." ECF No. 43-3 (referring to the observations of Blair and Bohe, among those of others). It also recounted instances of hostile conduct by Lieb. Collectively, these complaints to the EEOC are more than sufficient to meet the exhaustion requirement.

## CONCLUSION AND ORDER

For the aforementioned reasons, the court DENIES Defendants' motion for summary judgment.

DATED March 31, 2023

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge